
# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-15-296

| | | |
|---|---|---|
| | | **Opinion Delivered** November 12, 2015 |
| DAVID EVERSOLE | APPELLANT | APPEAL FROM THE POLK COUNTY CIRCUIT COURT [NO. DR-2014-80] |
| V. | | |
| RITA BLACKWELL EVERSOLE | | HONORABLE J.W. LOONEY, JUDGE |
| | APPELLEE | AFFIRMED |

## BART F. VIRDEN, Judge

David Eversole appeals the order of the Polk County Circuit Court entered on December 16, 2014, denying his request for modification of the custody agreement set out in the "Parenting Plan" incorporated into the parties' divorce decree. Specifically, David argues that the circuit court erred in finding that there was no material change in circumstances to warrant a change of custody or visitation. We disagree, and we affirm.

I.     *Facts*

Rita and David Eversole lived in Georgia when they were divorced in 2012, and the original decree awarding joint custody of their daughter, P.E. (born 2010), was entered there. The original parenting-plan agreement (plan) incorporated into the decree set forth the details of visitation and communication between David and P.E. According to the plan, David was allotted four consecutive days of visitation with P.E. each month, and he was

SLIP OPINION

required to give Rita no less than fourteen days' notice when selecting his days. The plan also set forth that "[f]ather shall be responsible for transporting the child to and from his parenting time."

In the "Communication" section of the plan, both parents were given "unlimited telephone and e-mail access to P.E. for reasonable lengths of time at reasonable times of the day." The plan provided that neither parent would harass or interfere with the other parent or the parent's time with the child while she was in the physical custody of that parent. The plan also set forth that "[b]oth parents shall make every effort to communicate to the other the safety and well-being of the child when in the other's possession; the parents recognizing that the child is very young and probably will not initiate a telephone call with the absent parent."

The section of the plan entitled "Welfare of the Child" set forth that each parent would promptly notify the other parent if any medical issues arose and that both parents would have access to any information from medical providers. The divorce decree provided that P.E. would be covered by David's health insurance and that Rita would be responsible for any copayments. David would be responsible for "all other reasonable and necessary expenses not covered by insurance[.]" The decree also set forth that "if a plan provider is available to treat the child and either party voluntarily incurs an out-of-network expense for the child, then that party shall be solely responsible for paying said cost." The decree provided that if dental insurance became available to either party, he or she would obtain it.

When Rita moved to Arkansas shortly after the divorce decree had been entered, communication between David and P.E. became problematic. David requested that Rita install the computer programs Tango and Skype, which would allow David and P.E. to see each other while they talked. Neither program had been required in the plan; however, Rita installed the applications. There were numerous technological issues, and face-time communication between David and P.E. was not always possible.

David filed a motion to modify custody, visitation, and support. Specifically, he requested that the court grant him custody of P.E. for at least half of the year until she began school. Regarding visitation, David requested that the circuit court modify the visitation agreement such that P.E. would be with him for the entire summer when she began kindergarten, and he further requested that the circuit court modify the plan to make Rita responsible for half the cost of transportation. David also requested that his child-support obligation be reduced. Rita filed a motion to dismiss, and she also filed a motion to have David held in contempt because, she asserted, he had hidden assets during their divorce.[1] She later filed a motion to modify child support.

A hearing on the matter was held on October 29, 2014. Both parties agreed to register the Georgia decree in the Polk County Circuit Court. David testified that, though he signed the plan, they did not "spend a lot of time working on it together." He testified that taking time off from work was difficult and that transportation costs were formidable.

---

[1]The circuit court denied Rita's motion for contempt, and she did not appeal the circuit court's ruling.

SLIP OPINION

David also testified that he felt that Rita had interfered with his communication with P.E. and that, though Rita had agreed to install and use the Tango application, she had offered only "unreasonable times" for communication. David testified that he wanted to speak with P.E. between 7:00 p.m. and 8:00 p.m. three or four times a week, even if it was while Rita was asleep or at work.

Text messages showing the difficulties concerning David and P.E. talking on the phone and talking via Skype were admitted into evidence. The texts reveal that some of the conflict arose because David had called at times when P.E. was engaged in an activity and could not come to the phone. At other times technical difficulties involving Skype and Tango made it impossible for David to communicate with P.E. in the manner he preferred.

David testified that he did not think his repeated texts had bothered Rita and that out of the 198 texts requesting to speak with his daughter, he had been allowed to communicate with P.E. only 86 times. David testified that Rita had not always returned his texts immediately and sometimes not at all. David also testified that Rita had tried to set up a Tango-communication schedule with him and that he had refused, though he acknowledged that a schedule would be a good idea.

David also cited his difficulty in adhering to the agreed-upon terms of the plan concerning visitation as a change in circumstances warranting a change in visitation and/or custody. David requested that the court modify the plan to require Rita to bring P.E. to Atlanta for his visitation and to bear some of the cost. He suggested that Rita could fly with P.E. to Atlanta, paying her own way, and that he would pay the cost of P.E.'s ticket. David testified that one of the reasons he had not had visitation and vacation time with P.E. was

that his work schedule was demanding. He testified that he believed Rita had interfered with his visitation and had used "every possible excuse" to keep him from P.E.

Text messages between the parties concerning visitation were admitted into evidence. Some of the texts show that David had wanted to exercise his visitation on the weekends that Rita was working. David expressed his preference that Rita drive P.E. to Hot Springs or Little Rock to meet him, thus saving him the cost of car rental; however, Rita generally had not been able to accommodate David's requests because she worked most weekends. Texts from David also showed that he had deferred his August visitation to September in part to save money. Texts showed that when David's requests for Rita to transport P.E. to a meeting place could not be accommodated, the parties agreed on a future date when Rita could arrange to take off from work. David observed in a text, "Well, I'd rather meet in Little Rock to save me $400." Texts show that he had sometimes requested that Rita pay his "extra expenses" related to travel. At a much-negotiated juncture, Rita sent a text stating, "I will allow week visitation in Sept. I will allow dates you requested even though they exceed 7 days. I will deliver/pick up from Hot Springs. The end. You decide yes or no." On cross-examination, David acknowledged that Rita had driven to Little Rock and to Hot Springs to offset his costs.

Rita also testified at the trial that both she and David had worked for an entire day, with lawyers present, to come up with the plan together, but despite the agreement, difficulties had arisen concerning visitation and vacation time. She testified that David had visited P.E. in July, but not August, and that to help him see P.E. she had agreed to let him visit in September. Rita also testified that David's texting and requests had been excessive

and were often ill-timed. Rita testified that sometimes he would text her ten times in ten minutes and would call her home phone if she did not respond to his texts. Rita testified that she had tried to set a Tango schedule so that David could call and be assured of speaking to P.E., but he had refused. Rita testified that P.E. loved to talk on the phone and that she did not believe it was necessary that every communication between David and P.E. include video. Rita acknowledged that there had been occasions when she had not allowed P.E. to talk on the phone because P.E. had been engaged in an activity that should not be interrupted. Rita testified that, although she did not think David and P.E. talked too often, problems had arisen when David had not been allowed to talk to P.E. immediately upon his request.

Rita testified that she had informed David that P.E. had started preschool two days a week, that she had put him on the contact list, and that he could call the school at any time. She testified that she had informed David about all of P.E.'s doctor appointments and that she had even texted David at three in the morning the last time she had to take P.E. to the doctor. Rita explained that she had not been aware of David's discount dental card until after she had scheduled an appointment with the dentist P.E. had seen previously. Rita testified that she had already sought and received David's approval of this dentist and that he had agreed to pay for the appointment.

The circuit court ruled from the bench that the parties would create an agreed-upon Tango-communication schedule. The circuit court also ruled that the summer vacation schedule was ambiguous, and it directed the parties to clarify what they had intended. The

circuit court ruled that no assets had been hidden by David and reserved all other issues for the written order.

In a letter order entered November 3, 2014, the circuit court commended the parties for their cooperation in agreeing that child support would be determined according to the chart and in agreeing to create a Tango-communication schedule. The circuit court also stated that the difficulties and costs David had encountered when exercising his visitation did not amount to a change in circumstances and that, in fact, the situation was exactly as the parties had contemplated and set forth in the plan.

The circuit court entered a written order on December 16, 2014, that registered the parties' decree, including the parenting plan. The circuit court increased David's support obligation to $1465 per month, and it found that David had the option of reducing the amount by $240 when he exercised his visitation. The circuit court found that there was no material change in circumstances to warrant a modification of the plan overall but found that the plan should be made more specific in sections where the terms were ambiguous. The circuit court set a face-time communication schedule for three times a week and resolved the summer-visitation-schedule issue by setting forth more specific terms. The court also found that David had not failed to disclose an asset, as claimed by Rita, and denied her motion for contempt.[2] This appeal followed.

---

[2] The court did not address Rita's request for attorney's fees, and attorney's fees are not at issue in this appeal.

I.    *Standard of Review and Applicable Law*

In reviewing domestic-relations cases, appellate courts consider the evidence de novo. *Brown v. Brown*, 2012 Ark. 89, at 6–7, 387 S.W.3d 159, 163. We will not reverse the circuit court's findings unless they are clearly erroneous. *Id.* When the question whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Baber v. Baber*, 2011 Ark. 40, at 9–10, 378 S.W.3d 699, 705. A circuit court maintains continuing jurisdiction over visitation and may modify or vacate those orders at any time when it becomes aware of a change in circumstances or facts not known to it at the time of the initial order. *Martin v. Scharbor*, 95 Ark. App. 52, 233 S.W.3d 689 (2006). Although visitation is always modifiable, to promote stability and continuity for the children and to discourage repeated litigation of the same issues, courts require more rigid standards for modification than for initial determinations. *Meins v. Meins*, 93 Ark. App. 292, 218 S.W.3d 366 (2005). Thus, the party seeking a change in visitation has the burden to demonstrate a material change in circumstances that warrants such a change. *Baber, supra.* The primary consideration regarding visitation is the best interest of the child. *Id.* Important factors the court considers in determining reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and the relationship with siblings and other relatives. *Id.* Fixing visitation rights is a matter that lies within the sound discretion of the circuit court. *Id.*

In the context of child-custody modification, our supreme court has stated that an appellant "cannot use the circumstances he [or she] created as grounds to modify custody." *Jones v. Jones*, 326 Ark. 481, 491, 931 S.W.2d 767, 772 (1996) (where Mrs. Jones appealed the decision of the circuit court ordering a change in custody where the court had relied, in part, on Mr. Jones's recent remarriage to support its finding that a material change in circumstances had occurred). The fact that a party entered into an agreement that later proved to be improvident is not a ground for relief. *Rogers v. Jennings*, 2010 Ark. App. 428, at 8, 375 S.W.3d 698, 703. A custodial parent's change in attitude is not necessarily sufficient to constitute a material change. *Stellpflug v. Stellpflug*, 70 Ark. App. 88, 93, 14 S.W.3d 536, 539 (2000).

## II.        *Analysis*

David argues that Rita interfered with his ability to communicate with his child and that the cost and arrangement of visitation was more burdensome than he had anticipated. He asserts that these factors constituted a material change in circumstances warranting a change in custody and visitation; therefore, the court erred in denying his request to modify the agreement. We disagree, and we affirm.

In *Stellpflug*, our court dealt with similar circumstances. In that case, the appellee wanted to modify visitation because the agreed-upon terms presented difficulties she had not anticipated, such as the expense of transportation and the emotional toll it had taken on her and her children. Our court held,

> Although we are sympathetic to the difficulties alleged by appellee, i.e.*,* transportation difficulties, financial difficulties, and homesick children, we must find that appellee simply failed to meet her burden below. Appellee merely testified that her children expressed a desire to see her during the summer, that her youngest

daughter gets homesick, and that she has financial difficulty exercising her summer visitation rights. However, she fails to cite any authority to show that these difficulties constitute a material change in circumstances to warrant modification of the visitation arrangements. Nor does she show why reducing appellant's visitation from thirteen weeks to six weeks, a substantial reduction, is in the best interest of the children.

*Stellpflug*, 70 Ark. App. at 93, 14 S.W.3d at 539.

In the present case, David, much like the appellee in *Stellpflug*, argues that the circuit court erred by not finding a change in circumstances. He asserts that the cost of travel and the difficulty of arranging visitation around his work schedule constituted a change in circumstances that merited alteration of the visitation-and-custody agreement set forth in the plan. Despite having helped form the agreement setting forth the terms of visitation and communication, David found it difficult to comply. As stated in *Stellpflug*, these difficulties do not constitute a material change in circumstances to warrant modification of the visitation arrangements, nor does David show how a change in custody or visitation would be in P.E.'s best interest.

David also asserts that Rita had not communicated with him about P.E.'s medical care and that she had taken P.E. to an out-of-plan doctor and dentist against provisions set in the divorce decree. He argues that Rita's alleged failure to keep him informed of medical decisions and her failure to comply with the portion of the divorce decree concerning in-plan providers constituted a material change in circumstances warranting a modification of custody.

David acknowledges that the circuit court did not specifically address the issue of P.E.'s medical care and related communication in its order, and he asserts that the circuit court committed reversible error by not doing so; however, it was David's burden to obtain

a specific ruling on the issue. When an appellant fails to obtain a specific ruling below, we do not consider that point on appeal. *See Bryant v. Bryant*, 2009 Ark. App. 231, at 6, 303 S.W.3d 91, 95. Without a ruling by the circuit court on this issue, there is nothing for us to review; therefore, we do not address the issue.

### III.    *Conclusion*

We find no error in the circuit court's determination that there was no material change of circumstances warranting the modifications David requested; therefore, we affirm.

Affirmed.

GLOVER and VAUGHT, JJ., agree.

*James E. Hensley, Jr.*, for appellant.

*Maddox & Maddox*, by: *John Maddox*, for appellee.