Cite as 2025 Ark. App. 454

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-24-641

| | |
|---|---|
| CANDIS SHRABLE (NOW MORGAN) <br> APPELLANT <br><br> V. <br><br> BRETT SHRABLE <br><br> APPELLEE | Opinion Delivered October 1, 2025 <br><br> APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT <br> [NO. 16JDR-18-730] <br><br> HONORABLE SCOTT A. ELLINGTON, JUDGE <br><br> AFFIRMED |

**BART F. VIRDEN, Judge**

Candis Shrable appeals the Craighead County Circuit Court's denial of her petition to modify custody and the decision to suspend her visitation. We affirm.

### I. *Relevant Facts*

Brett and Candis were married in 2008 and have two children, MC1 (born in 2012) and MC2 (born in 2014). On October 18, 2018, Brett filed an amended complaint for divorce, and Candis counterclaimed for divorce. On October 26, the court entered a temporary order awarding Candis primary custody with standard visitation to Brett. The temporary order set forth the parties' duties regarding the children's care during the pending divorce and also provided how some of the parties' personal property was to be divided.

While the divorce was pending, Brett filed several motions for contempt based on Candis's refusal to allow him to take possession of his personal property, including the title to his car; failure to pay his attorney's fees as ordered; refusal to allow him to sell the property that the court ordered to be sold; failure to take the children to their yearly physicals; and failure to comply with the court order to verify her claim that she was pregnant.

On January 16, 2020, the circuit court entered the divorce decree awarding primary custody to Brett. The court considered Brett's ability to care for and nurture the children and found that the best interest of the children "weighs heavily in favor of being placed in the legal custody of [Brett]." The court found that Candis lacked credibility. Specifically, the court cited her history of issues related to Brett's personal property, her false allegations to Brett's friends and employer that he had engaged in misconduct, her lack of concern for his career, and the harm her allegations caused others. The court set forth coparenting terms, which included not disparaging each other, mistreating each other, or discussing the divorce with the children; allowing the children access to telephone conversations with the noncustodial parent; allowing the other parent the right of first refusal regarding babysitting; cooperating with each other to give extra time with the children; refraining from disrupting the other parent's time with the children; and generally keeping the children out of the decision-making process regarding visitation and custody. Candis was ordered to pay $267 in child support every two weeks, and Brett was to keep the children on his insurance. The parents were ordered to equally divide any medical bills.

On March 3, 2020, Brett filed a motion for contempt. Brett accused Candis of continuing to refuse to return his personal property, and he asserted that Candis had been arrested for driving while intoxicated on February 23, at 2:30 a.m. Brett explained that Candis was supposed to pick the children up the next morning but canceled because it was raining and "another event interfered," which he believed was her arrest. Brett contended that Candis abused alcohol and drove without current tags, a license, or insurance; however, despite her actions, she held him responsible for her arrest. Brett stated that Candis had attempted to "poison the minds of the parties' children" by telling the children that the change of custody was temporary, and Brett "should be ashamed of himself for stealing them." Since then, she had refused to swap weekends to accommodate his work schedule, had not offered him babysitting and instead left the children with family members, and had baselessly requested a welfare check at the children's grandparents' home, which upset the children. Brett requested that the court suspend overnight visitation until Candis submitted to a psychological evaluation and restrain her from leaving Arkansas with the children. On October 9, Brett filed an amended petition for contempt, termination or limitation of visitation, and other relief. In addition to his original claims, Brett explained that Candis had moved without providing an address and had changed jobs, cutting off his child support. Candis was in arrears $1,176.64 and owed Brett $1,226.78 in medical expenses.

Candis responded, denying that she had interfered with the distribution of property and denying that she had not been unable to pick up the children because of "any alleged traffic violations." She also explained that she was on medical leave from her job for a heart

condition and was not in willful contempt of the order to pay child support or medical bills because she was unable to earn income.

After a hearing on November 9, the court entered an order finding Candis in contempt regarding the property-distribution issues and for lack of payment of child support and payment of half the medical expenses. Candis was ordered to make the appropriate reimbursements and return Brett's property.

On February 21, 2021, Brett filed a petition for emergency relief in which he explained that on February 17, Candis was driving and struck another vehicle; however, she continued driving, knocked down a mailbox, and drove home. The other driver followed her and called the Jonesboro police, who arrested Candis at her house. She was charged with careless and prohibited driving, leaving the scene of an accident involving property damage, and DWI. Brett noted that this was her second arrest for DWI and asked the court to suspend visitation until the issue was resolved. He attached the police reports of the most recent incident and the officer's report. He also included the "Driver Control Hearing Summary" from her 2020 offense. The summary showed that Candis had violated Ark. Code Ann. § 5-65-103,[1] and as a result, she was ordered to attend alcohol education and pay a $150 reinstatement fee; her license was suspended until September 24, 2020; and after that, an interlock device would be installed on her vehicle.

---

[1]Driving or boating while intoxicated.

On February 25, the court entered the order suspending Candis's visitation, finding that "the minor children of the parties could be irreparably harmed if the visitation with [Candis] is not suspended." The order was set to expire on March 11, the day of the hearing, "unless the Court, for good cause, extends it for a 14-day period, or [Candis] consents to a longer extension." On March 25, the court granted Candis's request for a continuance to obtain counsel and set a new hearing date of April 7. The court found that Candis's visitation would remain suspended until the hearing took place.

On September 15, 2021, Brett filed a petition to extend suspension of visitation, for the appointment of an attorney ad litem, and other relief. Brett explained that MC1 expressed to her therapist that she was anxious about visitation with her mother. MC1 reported that Candis had hit her, told her she wished she was not her child, called her bad names, and accused her of stealing. MC1 claimed that Candis smelled like alcohol and yet denied drinking, and Candis had men at the home that she was not comfortable around. Candis responded, denying the allegations.

A hearing was held on September 27, at which the court addressed Brett's petition to extend the suspension of visitation, request for the appointment of an attorney ad litem, motion to compel discovery, and motion for additional child support and medical-bill arrearages. Candis had hired an attorney that morning and requested that the court stay all motions except the petition to extend the suspension of her visitation. Brett objected, explaining that after the court granted the last motion for a continuance, the court had told Candis to inform the court when she obtained a new attorney, and a new hearing date would

5

be set. Brett explained that this was the first he had heard about Candis's new attorney. He explained that he brought MC1's counselor's report to court that morning but had not scheduled the counselor to be there for the hearing. He stated that he would have done so had he known that Candis had a new attorney and was ready to proceed. Candis refused to allow the counselor's report to come in because she wanted to cross-examine the counselor. The court continued the case and determined that Candis could have supervised visitation at Brett's discretion.

The same day, after the hearing, Candis filed a motion responding to Brett's petition to suspend visitation, asking the court to dismiss the petition.

From October 2021 to September 2023, Candis's visitation remained suspended. On September 29, 2023, Candis filed a petition to modify custody and other relief in which Candis alleged that a material change in circumstances had occurred. Namely, Brett had moved with the children to Mountain Home, making visitation more difficult. Also, Candis accused Brett of alienating the children from her by speaking negatively about her to the children, and consequently, the children began reacting negatively to her, even hanging up on her during phone conversations. Brett refused to allow significant contact with the children and refused to respond to her texts requesting to speak with them. Brett refused to send photos, and if he posted photos on Facebook, he prevented her from printing them by adding a watermark bearing his and his new wife's name. Candis accused Brett of having been angry and rageful at games he coaches to the point that parents were complaining.

Candis contended that she lived in a stable home and was remarried with a new baby and wanted MC1 and MC2 to know their sibling.

Brett responded, reserving the right to plead further after investigation of Candis's attempt to slander him. Specifically, Brett alleged that Candis had interfered with his employment by contacting his employer and making false allegations about him.

At the hearing on March 28, 2024, the court heard evidence and testimony regarding the previous motion and petitions, including Candis's motion to modify custody and Brett's request for continued suspension of visitation. Brett testified that since the suspension of Candis's visitation three years earlier, she had come to eat a meal with the children twice, and she attended one of MC2's football games, three of MC1's volleyball games, and three of MC1's basketball games. He explained that he had offered Candis visitation during the holidays and other times, but most of the time she did not take him up on his offer. Brett testified that MC1 had been in counseling since 2021, which had helped with her anxiety regarding her mother, but she still "gets some pretty bad peak anxiety whenever she thinks things are gonna change." Brett testified that Candis chose to communicate on Friday nights, when she knew he was coaching a football game. She left voicemails demanding to talk to the children at that moment, knowing that he was unavailable. The children communicated through his cell phone because he blocked Candis from their phones after an incident in October 2021 during which Candis "badgered" MC1 by calling her names until she broke down and cried. Consequently, MC1 did not want Candis to have access to her by phone. Brett explained that MC1 is Candis's "blame person," and Candis will not take responsibility

for her own mistakes and situation. Brett stated that Candis gets to talk to the kids on his phone eight times out of ten, and if she calls at a bad time, he has them call her back. Most of the time, he has to force them to talk to her, and when they are on the phone, Candis disparages him and his new wife, Kendra. Sometimes the kids hang up on her, and Brett explained, "I guess you can only tell someone bye so many times before you eventually hang the phone up." Brett testified that since the blocking incident, he recorded their conversations despite the divorce decree order that no phone calls be recorded. Brett claimed he was not aware of that provision. He testified that the children had been enrolled in Mountain Home School District for almost four years, since June 2020, and were getting straight As. He took Candis's name off the children's school paperwork when her visitation was suspended. Brett testified that sometimes he gave Candis the children's sports schedules, and sometimes he did not. Additionally, Brett testified that Candis had made allegations to the Mountain Home School District administration attempting to destroy his career, and he was interviewed by the school district regarding those allegations. The school district did not make any true findings against him.

MC1's therapist, Lynn Delgado, testified that when she first started seeing MC1 in July 2021, she "presented extremely anxious with low self-esteem and had difficulty expressing fears regarding visitation with her mother." MC1 attended therapy on an on-and-off basis until January 2023 because she was anxious about Candis coming to her school events and being "really persistent and asking questions from the people that she was engaging with; her friends, taking pictures of them." MC1's friends were uncomfortable

around Candis, and Delgado considered Candis's picture-taking and asking for information from friends to be a form of stalking. MC1 told Delgado that her mother had hit her, called her bad names, told her that she wished she was not her daughter, and blamed her for things that were not her responsibility. Candis had pointed a gun at her own head and told MC1 that she would harm herself and blame MC1 for it. Candis disparaged her new clothes and did not like that she was bonding with her stepmother by cooking, shopping, and using make up. MC1 believed Candis was using the new baby to try to manipulate her to visit. Delgado testified that in therapy, MC1 had developed healthy boundaries and confidence and had begun to smile. Delgado did not think it was in MC1's best interest to resume visitation and stated that MC1 did not want to live with her mother.

Candis testified that she did not remember much about the allegations she made against Brett regarding misconduct related to his job. She denied trying to get him fired or hurt his reputation and claimed that she went to the school district only to discuss "things that I was made aware of for the concern of my children as well as others." She agreed with the court's decision finding her allegations to be unfounded and outrageous, but "the whole situation, I guess, is different. What was kind of discussed that day is different than the situation that was going on currently." Candis agreed that she had not paid child support as ordered, explaining that she had not been employed due to a heart condition, and she had chosen to stay home with her new baby. Candis explained that she tried to attend the children's sporting events, but Brett had not consistently given her the schedules. Eventually she joined an online group that listed the football schedule. Candis testified, "I think ever

9

since custody has changed they've had to seek counseling, their relationships have went downhill. We went from co-parenting to no co-parenting." She did not believe she was responsible for her estrangement from her children: "I feel like actions that I have taken in the past is the reason I'm not—they're not present with me. But their behavior, I don't feel like is my fault." The driver control hearing summary from Candis's second uncontested DWI was admitted into evidence and showed that her license was suspended for two years, from March 2021 to March 2023, and after the suspension, an interlock device would be put in place. Candis testified that she did not believe the DWIs should have had any effect on her visitation. Candis denied ever putting a gun to her head and accused Brett of drunkenly putting a gun to his head in front of the children a few months before they separated. Regarding phone contact, she stated that the kids hang up on her, and it had been hard to contact MC1 since she had been blocked. She denied knowing that Brett coaches on Friday nights. She testified that when she talked with the kids, she could hear Brett yelling in the background during phone calls, calling her an idiot and worthless, and making remarks about child support. She testified that she believed Brett was trying to make his new wife their children's mother. She accused Brett of being emotionally abusive, encouraging the kids to be bullies on the playing field, and commenting on MC1's weight and eating. She recalled a time at a volleyball game when Brett told her to stop talking to MC2 and that he would come see her later, and she had noticed that the children looked to him before they answered her questions.

On May 31, 2024, the court entered the order denying Candis's petition to modify custody, determining that it was not in the children's best interest to order joint custody because she and Brett could not coparent. The court found that the children were thriving in their father's custody, and his home was stable. The court found that both parents were at fault for their inability to coparent, but Candis "bears the much larger share" and refused to accept any responsibility for the problems she has caused. Brett was ordered to work on "fulfilling his custodial duty to facilitate a meaningful relationship" between the kids and Candis, and the court found that the children needed to have a relationship with both parents. The court determined that the emergency order and the continued suspension of visitation were justified by the evidence, and Candis was primarily responsible for the delays. Specifically, the court found that Candis "has been represented by four different good lawyers during the period of delay, and that she could have obtained a hearing for relief during that period of delay." Both parties were ordered to attend six individual counseling sessions to address coparenting issues, and the court ordered that the suspension of Candis's visitation would remain in effect until she had finished individual counseling. The court determined that after the parties completed individual counseling, family counseling would begin. The court included "good conduct" provisions in the order regarding telephone communications; extra time; sharing medical, school, and counseling records; prohibiting inappropriate conduct; diligent communication regarding scheduling changes; refraining from involving the children in parenting decisions; and cooperating in fluid parenting situations.

Candis timely filed her notice of appeal, and this appeal followed.[2]

## II. *Discussion*

### A. Standard of Review

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hewett v. Hewett*, 2018 Ark. App. 235, 547 S.W.3d 138. We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference is even greater in cases involving child custody, and a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

### B. Points on Appeal

### 1. *Candis's petition to modify custody*

For her first point on appeal, Candis argues that the circuit court clearly erred when, in denying her petition to modify custody, it failed to make *any* findings regarding the best interest of the children or whether a material change of circumstance occurred. Her argument is not well taken.

To modify a custody decree, the circuit court must apply a two-step process: first, the court must determine whether a material change in circumstances has occurred since the

---

[2]After the notice of appeal was filed, Brett filed a petition to delay Candis's visitation, which the court did not address and is not relevant to this appeal.

divorce decree was entered; second, if the court finds that there has been a material change in circumstances, the court must determine whether a change of custody is in the child's best interest. *Shell v. Twitty*, 2020 Ark. App. 459, 608 S.W.3d 926. Candis's argument fails, because in denying her petition to modify custody, the court made best interest findings supporting the decision, including that the children were thriving in Brett's custody, his home was stable, and Candis refused to accept responsibility for MC1's anxiety.

Candis also argues that the circuit court erred by failing to find that Brett's alienating behavior constitutes a material change in circumstances warranting a change of custody, and the court erred in denying her petition for primary custody of MC1 and MC2. We disagree.

Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). The party seeking modification has the burden of showing a material change in circumstances. *Id*. Factors that are appropriate to consider when determining whether there has been a material change of circumstances include, but are not limited to, one parent's relocation, the passage of time, the remarriage of one or both parents, a strained relationship between the parent and child, and the preferences of the children. *McCoy v. Kincade*, 2015 Ark. 389, 473 S.W.3d 8. A change in the circumstances of the noncustodial parent alone is not sufficient to justify a change of custody. *See Fudge v. Dorman*, 2017 Ark. App. 181, 516 S.W.3d 306. The crux of these cases is that a child-custody determination is fact specific, and each case ultimately must rest on its own facts. *Redman v. Redman*, 2024 Ark. App. 562, at 11, 701 S.W.3d 40, 46; *Self v. Dittmer*, 2021 Ark. App. 85, at 9, 619 S.W.3d 43, 48.

Candis relies on the testimony that Brett engaged in alienating behavior by monitoring and recording phone conversations, blocking her from the children's phones, disallowing contact with her at the children's sporting events, blocking her from access to the children's school and medical records, and moving to Mountain Home.

It is true that failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. However, a finding of parental alienation does not *require* that the court change custody to the nonalienating parent. As stated above, other factors may also be considered by the court, such as a strained relationship between the parent and child, and the preferences of the children. *See McCoy*, *supra*.

To support her argument, Candis cites *Turner v. Benson*, 59 Ark. App. 108, 953 S.W.2d 596 (1997), in which the circuit court found a material change of circumstances due to parental alienation. In *Turner*, the minor child had begun using his stepfather's surname, the mother had interfered with the visitation schedule, and she had made derogatory comments about the father to the children. An expert witness testified that the children had rejected their father without any show of emotion. The court found that the mother's years-long history of alienating the father from his children constituted a material change of circumstances warranting modification of custody and changed primary custody to the father. In *Turner*, this court affirmed the circuit court's decision because it was supported by the evidence.

Candis's comparison to *Turner* is misplaced, because here, as in *Turner*, the evidence supports the circuit court's decision. The court considered testimony from MC1's therapist that Candis physically and mentally abused MC1. Brett testified that MC1 did not want to have visitation with her mother and that Candis refused to accept any responsibility for her children's emotional issues. Contrastingly, the court found that Brett had provided a stable home in which the children had thrived and heard his testimony that he had tried to facilitate visitation, but Candis declined his offers. Moreover, the court found Candis lacked credibility by making false allegations against Brett and refusing to accept responsibility for her part in MC1's anxiety. We will not substitute our judgment for that of the circuit court, which observed the witnesses firsthand. *Wallis v. Holsing*, 2023 Ark. App. 137, at 6, 661 S.W.3d 284, 288. Recognizing the superior position of the circuit court to evaluate the witnesses and their testimony, we are not left with a definite and firm conviction that the circuit court made a mistake in continuing Brett's primary custody of the children, and as in *Turner*, the evidence supports the court's decision; on this point, we affirm.

### 2. *The court's coparenting and joint-custody findings*

For her next point on appeal, Candis argues that the circuit court erred in determining that sharing joint custody is inappropriate due to their inability to coparent. Candis argues that she requested *primary* custody, and the court's joint-custody ruling was an extraneous ruling immaterial to her request such that the court's finding constitutes reversible error. We disagree.

15

Here, the circuit court's findings regarding joint custody and the parents' inability to coparent in no way constitute clear error. While joint custody was not suggested by the parties, the court's findings regarding the parents' ability to cooperate are material to the court's custody and visitation decision. Indeed, the court made explicit findings that the children's best interest would be served by better communication and cooperation from the parents and couched these findings as coparenting issues. We find no error and affirm.

3. *Brett's emergency petition and the order continuing suspension of visitation*

For her last point on appeal, Candis propounds several related arguments regarding the initial suspension of her visitation and the continued suspension of her visitation. None have merit.

First, Candis claims that the circuit court erroneously based the suspension of her visitation on hearsay evidence—namely, the police report regarding her second DWI arrest. Her argument is not preserved for appeal. Candis did not timely raise a hearsay objection to the petition for suspension of visitation. An issue must be presented to the circuit court at the earliest opportunity to preserve it for appeal. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Candis's first opportunity to object to the basis for the petition was before or when she filed her first motion for a continuance. In her motion, she asked for more time to hire a new attorney, but she failed to object to the basis of the petition. Candis requested and was granted several more continuances over the next few years, never once objecting to the basis of the original petition. For the first time, at the September 27, 2021 hearing, her newly hired counsel stated that the petition was based on hearsay; however, the opportunity

16

to object had passed, and additionally, counsel did not obtain a ruling on the issue. When an appellant fails to obtain a specific ruling below, we do not consider that point on appeal. *Eversole v. Eversole*, 2015 Ark. App. 645, at 11, 476 S.W.3d 199, 205. Because Candis's argument regarding the basis of the petition is unpreserved, we cannot reach the merit of this argument.

Candis also asserts that there was no hearing regarding the suspension of her visitation until 2024, and because there was no hearing, the circuit court never made the required finding that "parenting time between the parent and the child would seriously endanger the physical, mental, or emotional health of the child[.]" *See* Ark. Code Ann. § 9-13-101(b)(1)(A)(vii)*(a)* (Supp. 2023). She is wrong. In the initial February 25, 2021 order suspending Candis's visitation, the circuit court specifically found that "the minor children of the parties could be irreparably harmed if the visitation with [Candis] is not suspended."

We now address Candis's arguments regarding the delay in setting a hearing date. Candis asserts that pursuant to the language of the February 25 order, the circuit court was required to find good cause for granting the first continuance extending the suspension, and it did not do so. Her argument is not well taken.

The order suspending visitation was set to expire on March 11, the date the court set for the hearing, "unless the Court, for good cause, extends it for a 14-day period, or [Candis] consents to a longer extension." In the first continuance order extending the suspension of visitation until April 7, 2021, the court found that Candis requested a continuance to obtain new counsel and granted the request for this reason, noting that the suspension would

remain in effect until a hearing took place. It is well settled under the doctrine of invited error that an appellant may not complain on appeal that the circuit court erred if the appellant induced, consented to, or acquiesced in that action. *See Hopper v. Hopper*, 2023 Ark. App. 504, at 7, 678 S.W.3d 602, 607. Because Candis requested this continuance, she cannot argue on appeal that the circuit court erred in granting it.

Candis also contends that she "did not consent to a longer extension"; however, not only did she fail to object to any continuance the court granted, but also, she requested all the continuances in the record except the final continuance, which Brett requested to obtain Delgado as a witness. Notably, by the end of that hearing, Candis agreed to that continuance because she wanted to cross-examine Delgado. As we discussed above, her argument raises the invited-error doctrine. In the order denying her petition to modify custody, the court found that Candis had been the cause of the delays, and she could have asked for a hearing on the matter at any time; thus, she cannot argue on appeal that the court's decision to grant her continuances constitutes error. Accordingly, we affirm.

Affirmed.

KLAPPENBACH, C.J., and WOOD, J., agree.

*Dodd, Kidd, Ryan & Rowan*, by: *Catherine A. Ryan*, for appellant.

*Tim Cullen*, for appellee.