Cite as 2026 Ark. App. 64

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-23-738

|  |  |
|---|---|
| | Opinion Delivered February 4, 2026 |
| DONALD FONDREN<br>APPELLANT/CROSS-APPELLEE | APPEAL FROM THE POPE COUNTY<br>CIRCUIT COURT<br>[NO. 58DR-22-71] |
| V. | |
| ADRIENNE FONDREN<br>APPELLEE/CROSS-APPELLANT | HONORABLE GORDON W. "MACK"<br>MCCAIN, JR., JUDGE<br><br>AFFIRMED ON DIRECT APPEAL;<br>REVERSED AND REMANDED IN<br>PART AND AFFIRMED IN PART ON<br>CROSS-APPEAL |

**CASEY R. TUCKER, Judge**

Appellant/cross-appellee Donald Fondren appeals the Pope County Circuit Court's divorce decree in which it awarded appellee/cross-appellant Adrienne Fondren physical and legal custody of the couple's one child, MC, born December 28, 2016, and awarded Donald supervised visitation. Adrienne cross-appeals, arguing that the circuit court erred in ordering that Donald's visitation would become unsupervised upon his providing his counselor with his psychological evaluation and completing twelve one-hour counseling sessions. Adrienne also argues on cross-appeal that the circuit court erred in prohibiting either party from having overnight guests with whom they are romantically involved when MC is present and in ordering that MC shall remain in the Dover School District. We affirm on direct appeal and affirm in part and reverse and remand in part on cross-appeal.

Adrienne filed a complaint for divorce on February 11, 2022, and alleged that she was the proper parent to have sole legal and physical custody of MC. Donald filed a counterclaim for divorce on February 17 seeking joint custody of MC. The case proceeded to trial via Zoom on May 2, 2023.

Sherry Bowley, who had been MC's counselor and play therapist since August 2022, testified that MC was in counseling because he "had witnessed a lot of things happen in his family" and was having some problems, such as anxiety and unusual fears. MC also was experiencing sleep difficulties. Bowley initially diagnosed MC with posttraumatic stress disorder but later changed that diagnosis to adjustment disorder and mixed disturbance of emotions and conduct. According to Bowley, MC has a lot of anxiety associated with his parents. He is a people pleaser and wants to make everyone happy. As a result, he has become dysregulated. He has difficulty paying attention, especially when the conversation is about his parents. MC also chews on the pads of his fingers.

Bowley testified that any time she mentioned "Mom, Dad, and anything that goes with his relationship, anything that goes with visitation, especially visitation, whether or not it's supervised, he becomes very dysregulated." At one time, MC told Bowley that he needed to have supervised visits with his dad. MC did not mention any issues with his mother's household to Bowley. MC told Bowley that he is the only one in his family whom his father likes. Donald tells MC that his mother's family are liars; initially, MC responded that they are not liars, but Donald got upset, so MC began responding yes to avoid making Donald mad. MC told Bowley that his dad "talks bad" about his mom during visitation and during

2

telephone calls.  MC also expressed to Bowley that his dad tells him to lie and say that his visits are supervised even when they are not directly supervised.  MC becomes visibly distressed when discussing these issues with Bowley.  In addition to emotional distress, MC experiences physical symptoms, such as stomach aches, due to increases in his anxiety when trying to avoid conflict.

Bowley testified about concerns she has with Donald's parenting.  She said that Donald speaks negatively about Adrienne, which hurts MC; Donald tells MC to say the visits are supervised even if they are not directly supervised; and Donald demands MC's full attention when he calls, even if MC is otherwise occupied.  Hearing his father criticize his family and his mother is damaging to MC, but Bowley did not think it amounted to emotional abuse.  Bowley continues to see MC on a weekly basis.  Bowley did not think that Donald is a danger to MC.

Adrienne's mother, Vickie Hull, testified that Adrienne was a stay-at-home mom and was MC's caregiver, while Donald was frequently absent.  Vickie described Adrienne's parenting as "just the best as could be" and testified that MC was happy and "just a good child" when he was with his mother. Vickie had seen Donald being "very gruff" and "mean" to Adrienne's minor son from a previous relationship. Donald would humiliate and "belittle" the child in front of other children, including MC.  Vickie told of an instance when Adrienne had called her crying and said she was afraid.  When Vickie arrived at Adrienne's house, she saw a hole in the door, overturned plants, and broken items.  The children who were present, including MC, were "all upset."  After Adrienne's and Donald's

3

separation, Donald continued to return under the guise of retrieving his property after Vickie thought he had all his property. Vickie and her husband were so concerned about Donald's aggressive behavior that they asked law enforcement to be present when Donald returned.

Vickie testified that when MC returns from visits with Donald, he is "kinda agitated," and it takes a while "to get him to calm back down." She described MC as being "real moody for a while" and "just really grouchy for a long time and he doesn't want anybody to really talk to him."

Vickie testified that "it's obvious that [Donald] has some problems with his mental health." Vicki described the frequent texts that Donald sends Adrienne as "controlling and obsessive and scary." When Vickie and her husband and two of their grandchildren crossed paths with Donald at Walmart, Donald exited the parking lot behind them, pulled up next to their car, and pointed at them while mouthing something they could not understand. Vickie testified that it scared them and the children.

Paul Hull, Vickie's husband and Adrienne's father, testified that Adrienne and MC appear to have a good relationship. Paul testified that his biggest concern with Donald was his anger and his temper. He stated, "I mean, he would blow up at times on them. But, I mean when you'd see him do that you'd just see the fear that goes over everybody." Paul described Donald as very aggressive and that "he's always having you believe that he is the type of person that, uh, that he is very dangerous, that he, if you crossed him he would, he would hurt you." Paul testified that he knew Donald loves MC, but "he needs some help" with controlling his anger. Paul had tried to prevent Donald from coming on his property

4

because Donald had torn up personal property at times, including pulling the wiring out of Adrienne's truck, and Paul wanted Adrienne to feel safe.

Donald testified that he voluntarily moved out of Adrienne's house and left MC with Adrienne. Donald owns a dump truck and works at Blackstone Construction. At the time of the hearing, he was working nights but was planning on returning to the day shift in a month. Donald testified that he was requesting joint custody and was hoping for a week on, week off schedule. At the time of the hearing, Donald had supervised visitation once a week and did not keep MC overnight. Donald agrees with the counselor that MC has adjustment disorder and that stability and continuity are important for MC. Donald thought MC was doing well in school, but he did not reach out to the school because he thought he was not allowed to do so. Donald testified that he asks Adrienne about MC's progress at school but that Adrienne will not talk to him about it. When asked if Adrienne would not talk to him because he had made threats, he answered, "On her? Not really." Donald acknowledged that Adrienne had texted him photos of MC's school project and of MC riding a stick horse in a little rodeo. Adrienne had also texted Donald after a storm to let him know MC was okay. Donald also acknowledged that Adrienne would text him when MC was sick but stated that she did not keep him informed consistently.

As to his mental health, Donald testified that he had not been officially diagnosed but that one of his counselors thought that he might have PTSD, and his counselors also had opined that he has anxiety and depression. Donald had undergone a psychological evaluation, which contained a history of abuse by his father when Donald was approximately

sixteen or seventeen years old. Some of Donald's siblings had accused their father of sexual abuse. Donald had experimented with drugs when he was younger and was treated for alcohol abuse. Donald testified, though, that he is not an alcoholic.

The psychological evaluation noted that Donald has a history of self-medication and that there were multiple indications of chaotic interpersonal relationships and suicidal comments. Donald initially denied that he made suicidal comments but eventually clarified that he never actually made a plan to commit suicide. The "Impressions" section of the evaluation stated that Donald

> has a chronic history of chaotic, impulsive, aggressive, substance abuse filled behaviors that have been reflected in multiple short termed marriages or intimate relationships as well as multiple law violations. To his credit he has demonstrated an attempt to manage these behaviors via mental health therapy and discontinuing excessive alcohol usage.

The report also stated that there was "not presently an indication of him being a danger to himself or others but the prognosis for increased emotional stability is guarded and contingent on continued use of mental health resources and avoidance of alcohol usage." Donald's diagnosis was "other specified trauma and stressor-related disorder," "alcohol use disorder – sustained remission," and "other specified personality disorder – with antisocial traits." The recommendation stated:

> It is strongly recommended that he continue in mental health treatment with Lena Handcock, LPC at Chenal Family Therapy. The therapy should have an emphasis on trauma and its effect on present functioning. The use of alcohol should be monitored closely as a feature of the work with the therapist.

Donald testified that he still drinks beer occasionally and did not "see a thing wrong with [his] drinking a couple of beers." However, he went on to testify that if necessary for him to gain back his child he would "never touch it again."

When asked if he had informed his current counselor that he had undergone a psychological evaluation, Donald testified that he had informed him before the evaluation and then after he received the results. When asked, "Do you recall testifying in your deposition you did not inform him you had taken a psychological evaluation?" Donald answered, "It was either him or Family Chenal." Donald testified that he did not recall testifying in his deposition that he did not tell his counselor about the evaluation. When asked whether he had informed his counselor that the doctor performing his evaluation said he should avoid alcohol and that avoidance would be part of his therapy, Donald answered, "Probably, yes. I mean, um, he asks me how much I've had to drink every time I go in there. I can't remember if I have told him what Doctor Adams had stated or anything."

Donald's current counseling notes did not reference alcohol usage. The notes did reference suicidal ideations, noting suicidal ideation as an area of risk, but went on to state that the level of risk was low and that Donald stated he would never do that to his children. Under "Current Mental Status" the report stated "Judgment/Impulse Control: Poor."

Donald admitted that he had been arrested for domestic abuse against the mother of one of his older children approximately thirteen or fourteen years earlier and had pleaded guilty. He also admitted that in approximately 2020 or 2021, he had been arrested for third-degree battery against the father of Adrienne's older son, pleaded guilty, and served time.

Donald admitted that as recently as thirty to sixty days before the hearing, he returned to Adrienne's parents' farm where Adrienne lived even though Adrienne's father had told him not to return. Donald admitted cursing at Adrienne.

Adrienne testified that MC is "very emotionally dysregulated" when he comes back from visitation with Donald. She described MC as "really stressed, really anxious" on those occasions and that MC would exhibit "explosive, combative behavior" toward her. Adrienne testified that she had "come to the realization that [her] husband's mental instability is, um, a little more severe that what I had originally thought." He had talked about taking his own life and even pulled a gun out and was screaming in a rage while he was in bed with her. Adrienne believes that Donald is very dishonest with himself and others as a result of his mental disorders. Adrienne described a time when Donald became enraged and, in front of MC, pulled out a gun and began ejecting shells from the gun. During this episode, MC pressed himself tightly against Adrienne and was sobbing and in complete distress. After that episode, MC began wetting the bed and biting the pads of his fingers. At least once, MC chewed on his fingers until blood was running down his hand.

At times Donald would tell Adrienne stories about men who had murdered their wives. On one such occasion, Donald explained in detail how a man working on an oil rig murdered and dismembered his wife and then folded her up and put her in the shaft of a drilling rig. Donald went into great detail using his hands to demonstrate. When Adrienne asked Donald why he was telling her this, he answered that he wanted to know whether she thought the man should be in a mental institution for the rest of his life or in prison, if he

had borderline personality disorder like he had. Donald texted Adrienne various mental disorders he thought he might have and, at one point, texted her about possibly being demon possessed.

Adrienne testified that Donald never showed interest in MC's well-being, never asked how he was doing, and never asked about his schooling. Adrienne does not think it would be good for MC for Donald to have unsupervised visitation or to have a fifty-fifty visitation schedule. Adrienne testified that Donald is the angriest person she had ever met. She has overheard Donald on the telephone with MC saying things such as "get away from them" and "tell her to shut the fuck up." At one point, Adrienne stopped MC's visitation with Donald because MC told her the visitation was not always supervised.

Shirley Sims testified on Donald's behalf. She has known Donald since he was a child. She was appointed to supervise his visits with MC a few months before the hearing. Shirley testified that she does not allow Donald to be with MC unsupervised. Shirley confirmed that Adrienne asked her whether Donald had said to MC that his relationship with Adrienne was irreparable because Adrienne had a boyfriend. Shirley denied that Donald had said that to MC but admitted that Donald asked MC whether Adrienne had a boyfriend and whether Adrienne still wears her wedding ring. Shirley admitted that she let Donald play basketball outside with MC while she stayed inside, but she had a camera system so she could watch—but not hear—them from inside. Shirley had never seen Donald angry or heard him discuss suicide. In her opinion, Donald and MC are crazy about each other. Shirley was not aware that Donald had previously been arrested for domestic abuse against

9

his prior wife or that he had pled guilty to a battery charge in 2020 or 2021. She testified that Donald did not discuss his personal married life with her.

Lisa Sims Fondren testified that she supervised Donald's visitation with MC from April 2022 until September 2022. She testified that she stopped being the supervisor because Adrienne said Lisa was not communicating as well as she should. According to Lisa, she never left Donald and MC unsupervised. Lisa never witnessed Donald exhibit suicidal or bad behavior. She never saw anything that gave her concern about Donald being with MC.

Donald's nineteen-year-old son, Tristan Fondren, testified that he has a good relationship with his father and with his half brother, MC. According to Tristan, Donald was never abusive toward him and never went into angry rages. Tristan testified that Donald never told him he had thoughts of killing anyone. Tristan stayed at Adrienne's house frequently while Donald and Adrienne were married and had a good relationship with Adrienne, although he and Adrienne argued a lot. Tristan admitted being in the car with his father in the spring of 2023 when Donald had an interaction with law enforcement that caused Tristan to become scared and want to go home.

At the conclusion of the testimony, the court ruled from the bench:

> The majority of the mother's case rests on the child's statements as related through the child's counselor. The counselor was very clear on two points regarding the child: One: The child is a people pleaser, wants everyone to like him. Two: The child changes his story on issues that are essential to the mother's assertion that the father is a danger to the child. Three: In addition to those two factors the child during the time of counseling was six years old and younger. I believe the counselor was truthful in her testimony, but as to

10

the child's statements I find that they cannot be relied upon by this court and are thus accorded no weight.

As to Donald, the court found that he was mostly credible but that he failed to disclose his psychological-evaluation results to his current counselor, indicating he is not completely candid with his counselor on all matters that are related to his treatment. The court found that Donald was truthful about his misunderstanding of the meaning of "suicidal ideation," especially considering his admission that he had made comments about suicide. The court went on to state that it was clear that Donald "has in fact exhibited suicidal ideations in the past." The court then addressed Donald's anger issues:

> It is also clear to me that although the father has had a history of anger which sometimes has led to violence, I do not find he has in any way been violent with the child and the evidence of physical violence toward the mother is at best sparse and certainly not supportive of the findings requested by the mother that the father is a danger to himself and others.
>
> The mother wants this court to find that the mental and emotional challenges of the father are worse than were found by the psychiatric examination. This refusal to accept the doctor's opinion is consistent with the mother's overall assessment of the father. She is desperate to paint the father worse than he is. The mother's credibility is damaged by the above noted desire to disregard the diagnosis of the psychiatric report.

The court continued in its assessment of Adrienne:

> In addition, the mother plays the victim and is quite good at it. She also plays good at placing care for the father. She presents the basic caring, giving careful presentation, wanting to nurture the relationship between the (quote) "child and her husband." Her actions evidence otherwise. Also an example of her lack of veracity is the multiple times that she referred to the child's "chewing his fingers off" to emphasize the negative mental impact the father has on the child. That was her intention. The description by the mother in her testimony was vivid and convincing that the injuries to the child were severe. However,

11

asked on cross examination if she took the child to the hospital, her response was a curt "for a Band Aid."

The court found that Donald and Adrienne have "issues," and while Donald was addressing his, he still had a long way to go. Adrienne on the other hand had "made no effort to seek assistance regarding same."

The court concluded that given Donald's issues with depression or anxiety and the findings of the psychiatric evaluation, joint custody was not in MC's best interest. It noted that Donald needed to further address his issues with anger and self-control, but there was no evidence he had ever been violent with MC. The court then "[set] forth a mechanism by which the ultimate relationship will be equal time between the parents and the child." It ordered Donald to provide his current counselor and any future counselors with the report of his psychiatric evaluation and continue with counseling at least once a month. The court then stated:

> After the psychiatric evaluation has been provided to the counselor the father shall attend 12 counseling sessions. I don't care if it's every week, there's going to be 12 counseling sessions and my idea here is catching up and that counselor being able to address the concerns that are set out in the psychiatric evaluation and do so in a manner that actually is relevant to seeing that the father complies with the recommendations.
>
> . . . .
>
> Once he attends the 12 counseling sessions, once those 12 counseling sessions have been completed, visitation will no longer be supervised. The visitation will be modified to every other week or every other weekend. Until then, just so we are clear, until then it will remain supervised. . . .
>
> When the visitation becomes no longer supervised the holiday visitation will be standard, but not the summer visitation. I am going to

continue to modify that. So standard holidays will apply, but no summer visitation for the summer of 2023. As to the summer of 2024, assuming everything continues on, all my prerequisites are met, then the father will have two one-week periods of visitation during the summer of '24. Summer '25, three one-week periods of visitation. Those are to be separated. . . . The summer of 2026 will be equally divided between the parties. The summer of '27 will again be equally divided between the parties and when school begins in the fall of 2027 the parties shall share equal time, with the mother remaining as the primary custodian. . . .

The child shall remain in the Dover Public School System.

The court stated it was also putting a "complete moratorium" on Donald's consuming alcohol. The court addressed Donald's four motions to hold Adrienne in contempt, denying three and granting one due to Adrienne's failure to provide Donald visitation without justification. For this infraction, the court sentenced Adrienne to fifteen days in the Pope County Detention Center but suspended the sentence as long as Adrienne did not violate any other court orders.

The court gave the parties a break to think about what it had ordered and to ask the court for clarification on anything that was not clear. The court then clarified that when Donald is nearing the goal of obtaining twelve hours of counseling, he should notify Adrienne in writing of the anticipated date of his final counseling session, and then the parties should work together to begin the unsupervised visitation on an agreed date certain.

Adrienne's attorney asked the court to reconsider finding Adrienne in contempt and imposing a suspended sentence of fifteen days' incarceration, which the court denied.

13

The court's bench ruling was memorialized in the divorce decree, which Adrienne's attorney drafted, and was filed June 12, 2023. Donald timely appealed, and Adrienne timely cross-appeal followed.

I. *Direct Appeal*

Donald's sole point on appeal is that the circuit court erred in denying his request for joint custody. His position is that the court, without any evidence, determined that Donald had not provided his psychological evaluation to his counselor and that this determination was the basis for the court's decision.

We review child-custody cases de novo but will not reverse the circuit court's findings unless they are clearly erroneous. *Inmon v. Davis*, 2025 Ark. App. 494, 724 S.W.3d 657. A finding is clearly erroneous when, although there is evidence to support it, after reviewing the entire evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id.* We give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given to their testimony. *Id.* Thus, a circuit court may disregard a witness's testimony if it finds it not credible. *See Oates v. Oates*, 2010 Ark. App. 345, 377 S.W.3d 294.

Joint custody is favored in Arkansas. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2025); *Tubbs v. Tubbs*, 2025 Ark. App. 315, 716 S.W.3d 204. There is a rebuttable presumption that joint custody is in the best interest of the child when deciding original child custody in a divorce action. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)*; *Tubbs*, *supra*. That presumption, however, can be overcome if the court finds by clear and convincing

14

evidence that joint custody is not in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)(*b*); *Tubbs*, *supra*. The preference for joint custody "does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child." *Tubbs*, 2025 Ark. App. 315, at 12, 716 S.W.3d at 212.

In the present case, the circuit court found by clear and convincing evidence that joint custody was not in MC's best interest. The court specifically found that Donald has depression and anxiety as well as anger and substance-abuse issues, all of which need to be addressed in counseling. The court further determined that Donald did not provide the results of his psychological evaluation to his current counselor. In making this determination, the court did not find Donald credible when he was questioned about providing his psychological evaluation results to his counselor. This determination was within the court's purview, and this court will not second-guess its judgment.

Because the circuit court's determination that joint custody is not in MC's best interest is supported by the evidence and this court is not left with the definite and firm conviction that a mistake has been made, we affirm on direct appeal.

II. *Cross Appeal*

Adrienne raises three points on cross-appeal: (1) the circuit court erred in setting an automatic future change to unsupervised visitation upon Donald's completion of twelve counseling sessions; (2) the circuit court erred in prohibiting either party from having unmarried cohabitation with romantic partners in the presence of MC without first considering whether such prohibition was in MC's best interest; (3) the circuit court erred

15

in restricting her right to move by ordering that MC would remain in the Dover School District.

## A. Automatic Conversion of Donald's Visitation

We agree with Adrienne that the circuit court erred when it ordered that Donald's visitation would automatically convert to being unsupervised upon his providing his psychological evaluation to his therapist and completing twelve hours of counseling. The court also erred in ordering that, assuming he met certain prerequisites, Donald's parenting time would increase over time so that in 2027 he would begin sharing equal parenting time with Adrienne. These provisions run afoul of Arkansas law.

*Bell v. Bell*, 2022 Ark. App. 279, 646 S.W.3d 678, was an appeal from an order modifying child custody but the same principles apply in the present case. In *Bell*, the court included a springing joint-physical-custody provision in its modification order. The provision provided that if the father moved within twenty miles of the children's school, custody would convert to fifty-fifty, joint-physical and legal custody with the parents exchanging the children week-on and week-off. In reversing, this court stated:

> Arkansas uses a present-based analysis when analyzing custody issues, and trial courts must examine the changes and best interest of the children presented as evidence to the court at the time of the final hearing, not changes that may occur weeks, months, or years down the road… Because the final order includes the springing provision that would automatically change primary physical custody upon the happening of a prospective event after the order of custody is entered, the provision is contrary to Arkansas law.

*Id*. at 17, 646 S.W.3d at 690 citations omitted. The court concluded on this point:

16

> An automatic change of physical custody from Lyndsay to joint physical custody simply if Zach moves within twenty miles of the children's school would remove the trial court from the determination of whether the change in physical custody is in the children's best interest at the time it occurs. Because an automatic change-of-custody provision does not allow the trial court to determine the children's best interest at some point in the future when the provision is triggered, we hold that it is unenforceable; accordingly, we reverse on this point.

*Id.* at 18, 646 S.W.3d at 690.

In the present case, the circuit court found that Donald suffered from depression and anxiety as well as anger and substance-abuse issues, all of which needed to be addressed in counseling. The court also found that Donald had suicidal ideation. And the psychological evaluation result reported an alcohol issue and the necessity of treating that as part of Donald's overall counseling plan, which the court acknowledged by placing a moratorium on Donald's consuming any alcohol.

In spite of these findings, which are supported by the record, the circuit court ordered that Donald's visitation with MC would automatically convert from supervised to unsupervised upon the completion of twelve counseling sessions and then increase incrementally over the course of a few years until Donald shared equal parenting time with Adrienne. This action effectively removed the circuit court's ability to determine whether the change from supervised to unsupervised visitation and increasing parenting time would be in MC's best interest at the time the change occurs. Such a springing provision does not provide the opportunity for the court to make a present-based analysis of MC's best interest. This is not in compliance with Arkansas's present-based-analysis approach. As in *Bell*, the

circuit court must determine what is in the best interest of MC at the time of the hearing, not make a determination based on a potential change that may take place weeks, months, or years down the road.

We also note that the court's determination that attending twelve one-hour counseling sessions was sufficient for Donald to begin unsupervised visitation and eventually achieve equal parenting time is not supported by the record. There was no testimony or other evidence at the hearing to support the court's determination that twelve one-hour counseling sessions would alleviate the court's concerns with Donald's behavioral issues. There was no guidance on what the court expected Donald to accomplish from those sessions. When Donald's counsel asked for clarification on Donald's required twelve sessions of counseling, the court stated:

> It can be 12 sessions day after day. It makes no difference to me. I do not want to arbitrarily - - I had to come up with an amount of time that I felt would be sufficient for his counselor, assuming one hour meetings. And I'm assuming that that's what they were. But to be able to address the concerns. He will also be able to address why he didn't make that available to him. I think there are several issues here that are important for the counselor to address and so that's why I came up with the twelve. But as far as when those can be done, he can make 12 consecutive appointments, in other words, 12 hours, I think maybe that should be the way I would term that. I want him spending 12 hours with his counselor after his counselor is advised of that psychiatric exam so the counselor can assist him in preparing better for where we are going in the next step.

While the court expressed its desire to not act arbitrarily, that is exactly what it did. The circuit court's decision to require Donald simply to attend twelve one-hour counseling sessions before automatically changing to unsupervised visitation and a graduated increase

in parenting time does not provide the court with the opportunity to determine whether the therapy was effective in alleviating whatever concerns the court had.

The circuit court erred in including a springing provision in its child-custody order and in its determination that twelve one-hour sessions would be sufficient to enable Donald to have unsupervised visitation and eventually equal parenting time without further evaluation of MC's best interest. Hence, we reverse on this point and remand this case for the circuit court to act in accordance with this opinion.

## B. Prohibition of Overnight Guests

Adrienne asserts that the circuit court erred in ordering that neither party could have overnight guests to whom they were not married but with whom they were romantically involved in the presence of MC without considering MC's best interest. We decline to reach the merits of this argument.

Adrienne's attorney drafted the divorce decree, which included by reference and attached as an exhibit the "Proposed Guidelines for the Fifth Judicial District Child Visitation and Related Matters" (the Guidelines). The Guidelines contain a provision prohibiting overnight guests with whom the parent is romantically involved when the minor child is present. Adrienne's drafting the decree and including the Guidelines is tantamount to invited error, and it is well settled under the invited-error doctrine that an appellant may not complain on appeal that the circuit court erred if the appellant induced, consented to, or acquiesced in the court's action. *Hamaker v. Hamaker*, 2025 Ark. App. 156, 708 S.W.3d 839; *Shrable v. Shrable*, 2025 Ark. App. 454, 724 S.W.3d 605. "An appellant may not

complain on appeal that the court erred if he induced, consented to, or acquiesced in the court's position." *Rothwell v. Rothwell*, 2025 Ark. App. 613, 25, __ S.W.3d __.

C. Requiring Adrienne to Keep MC in the Dover School District

Adrienne contends that the circuit court erred in ordering her to keep MC in the Dover School District. We agree.

Arkansas recognizes a presumption in favor of relocation for custodial parents with primary custody. *Shell v. Twitty*, 2020 Ark. App. 459, 608 S.W.3d 926; *Ingle v. Dacus*, 2020 Ark. App. 490, 611 S.W.3d 714. Further, "it is a matter within the custodial parent's right to send or to continue to send his child to any particular school." *Hyden v. Hyden*, 85 Ark. App. 132, 141–42, 148 S.W.3d 748, 754 (2004).

Since it is the custodial parent's right to choose the school for the minor child, and we have recognized a presumption in favor of the ability to relocate, the circuit court erred in issuing a blanket order that MC would remain in the Dover School District. Therefore, we must reverse on this point.

We reverse and remand the decree for proceedings consistent with this opinion as it pertains to Donald's visitation and parenting time. Likewise, we reverse and remand the court's decree for proceedings consistent with this opinion as it pertains to the order requiring MC to remain in the Dover School District. We affirm the decree as it pertains to the provision that the parents will not have overnight guests with whom they are romantically involved while MC is present.

Affirmed on direct appeal; reversed and remanded in part and affirmed in part on cross-appeal.

HARRISON and THYER, JJ., agree.

*Lisa Norris*, for appellant.

*Weimar Law Office*, by: *DeeAnna Weimar*, for appellee.