Cite as 2025 Ark. App. 315

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-24-267

| | |
|---|---|
| JUSTIN TUBBS<br><br>APPELLANT<br><br>V.<br><br>CAITLIN TUBBS<br><br>APPELLEE | Opinion Delivered May 21, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SECOND DIVISION<br>[NO. 60DR-23-105]<br><br>HONORABLE CASEY R. TUCKER, JUDGE<br><br>AFFIRMED |

**BART F. VIRDEN, Judge**

The Pulaski County Circuit Court entered a divorce decree in which it awarded appellee Caitlin Tubbs custody of the parties' minor child (MC). In the decree, the trial court also granted Caitlin's motion in limine after finding that appellant Justin Tubbs had violated the trial court's scheduling order. On appeal, Justin argues that the trial court erred in granting Caitlin's motion in limine, which prohibited him from introducing witnesses and exhibits during the final hearing, because doing so was contrary to consideration of MC's best interest. Justin also argues that the trial court erred in finding that the presumption that the parties should share joint custody of MC was rebutted when the trial court heard only Caitlin's side of the evidence. Justin further contends that the trial court conducted no analysis of the effects of domestic abuse on MC's best interest and erred by awarding Caitlin

sole custody of MC because the evidence showed that Caitlin herself had committed acts of domestic violence and engaged in a pattern of domestic abuse. We affirm.

## I. *Background*

The parties were married on October 1, 2021, and MC was born in late September 2022. The parties separated on January 7, 2023, following a physical altercation. Caitlin filed a complaint for divorce on January 11 and asked for sole custody of MC. In answering the complaint, Justin simply denied that Caitlin should have sole custody of MC. Caitlin also filed a petition for an order of protection on January 11, which was granted as to both her and MC. Following a hearing in June, the trial court extended the order of protection for one year—but only as to Caitlin. The trial court noted that, had Justin filed a petition for an order of protection against Caitlin, it would likely have been granted.

On August 31, Justin filed a motion for a hearing on visitation. In this motion, Justin requested that the parties be awarded joint custody of MC. A hearing was held on visitation, and an agreed order on temporary visitation was entered on October 31 in which Justin received gradual visitation with MC, including overnight visits, leading up to the divorce hearing on December 5.

On September 25, the trial court entered a scheduling order in which the parties were instructed to exchange witness and exhibit lists ten days before the final hearing. The order provided that the lists should be exchanged even if the names of witnesses had previously been disclosed during discovery. The order further provided that witnesses not disclosed would not be allowed to testify absent an agreement of the parties or unless extraordinary

2

circumstances were presented to the court. Caitlin filed her list on November 27, and Justin filed his list on November 30. Caitlin filed a motion in limine requesting that Justin be prohibited from introducing witness testimony and exhibits given his failure to comply with the trial court's scheduling order.

On December 5, the trial court first addressed Caitlin's motion in limine. Justin's counsel explained that there were no additional witnesses that had not been disclosed during discovery, so there would be no surprises. Justin's counsel stated that he had not ignored the scheduling order; rather, he had been out of the office for several days working on a trial, and his secretary had held onto the list until he could look over it. The trial court asked why an exception should be made, and Justin's counsel said that it was not his client's fault. Caitlin's counsel said that there was a scheduling order in place for a reason and that he believed there were witnesses who had not been disclosed during discovery. Caitlin's counsel later identified four of eight witnesses who had not been disclosed. The trial court then granted Caitlin's motion as to Justin's witnesses but noted that counsel would be permitted to call Justin because he is a party. As for exhibits, the trial court said in response to Caitlin's request to exclude those as well, "We'll see how it progresses." The trial court then heard the custody matter.

Caitlin testified that Justin was more excited about a side-by-side UTV that was to be delivered the same week that MC was born than he was about MC's birth. She said that Justin left to go hunting when MC was only six days old. Caitlin testified that Justin prioritized hunting over spending time with her and their newborn. She said that Justin had

told her that hunting was only three months out of the year and that she had him the other nine months. Caitlin testified that, when she pointed out that MC would change a lot and that he was missing out on time with her while she was little, Justin told her that MC would not change that much over a weekend.

Caitlin described the physical altercation on January 7 that led to the parties' divorce. The parties had returned home separately after attending a wedding at which both had been drinking. Caitlin said that Justin had been disrespectful to her at the wedding. Caitlin said that MC was asleep in a bassinet beside their bed and that she had asked Justin to sleep in the guest bedroom, but he refused. Caitlin testified that she pulled on Justin's arm but could not get him to move, so she grabbed him by his hair. She testified that Justin threw her on the floor and put his foot on her chest and throat. Caitlin said that Justin choked her, and she described being thrown around the room "like a ragdoll." She said that MC began crying. Caitlin testified that Justin told her that she was going to learn to never grab him again. They yelled at each other and called each other names. Caitlin then took MC to her sister's house, and Justin went back to sleep. A few days after the incident, Caitlin sought treatment at an urgent-care clinic and then reported the matter to police. Photos of her bruises were introduced into evidence.

Caitlin testified that there had been other incidents of abuse. She said that after a different wedding, the two were arguing on the drive home. Caitlin admitted she had hit Justin's face; he then grabbed her throat, shoved her against the car window, and told her that if she hit him again, he would kill her. Caitlin said that there was another time that they

were arguing at home in the master closet next to the bathroom. She conceded that she had hit Justin and said that he shoved her so hard that she fell over the toilet and broke the toilet's lid. Caitlin recalled another time that she was holding MC in one arm when Justin yanked her arm down, causing her to almost drop MC. Caitlin admitted that she has always struck Justin first and said that she is "beyond ashamed" for that. She said, however, that she has never left marks on Justin. Caitlin testified that she did not think Justin's reaction on January 7 was a proportionate response to her slapping him, even if he was only defending himself. Caitlin said that she has taken three anger-management courses and attends weekly therapy for trauma and conflict resolution. She testified that Justin had zero remorse or regret over the January 7 incident and that he had even told her through text messages that she deserved the beating.

Caitlin testified that, following the January 7 altercation, Justin had not asked to see MC until June 30, and he had not given her any financial support. Caitlin said that Justin has no home of his own; rather, he lives with his parents an hour away from MC's daycare and doctors; Justin's father is a convicted felon; his parents have firearms lying around; and MC does not have a room of her own. She said that Justin, a registered nurse, takes testosterone without a prescription and that he has returned MC from visitation with a 103-degree fever. She stated that Justin had refused to add MC to his dental-insurance plan. When asked why Justin should not have joint custody, Caitlin said that he was not a 50/50 parent when he had the chance and that Justin and MC do not know each other.

Cheryl Lease, Caitlin's counselor, testified about the cycle of abuse and stated that the one being abused will have a fight or flight response when the abuser "explodes" and that Caitlin's response was to fight because she had no other ways to cope. Lease also talked about battered-woman syndrome and said that when an abuser says "[i]f you hadn't slapped me, I wouldn't have had to put you on the ground," the abuser is really saying that the abused person deserved it. Lease said that Caitlin is getting better and making progress. She said that Caitlin is dealing with anger management and being nonreactive to "button-pushing" and that she is learning about coparenting and how to walk away. Lease said that she is aware that Caitlin was also physically abusive but did not know the details.

Rosie Blasingame and Annie Covington, Caitlin's friends, testified to her abilities as a mother. Blasingame said that Caitlin is an "incredibly attentive mother," and Covington, who has three children of her own, said that she has no concerns with Caitlin as a mother.

Justin agreed that there is a pattern of abuse—Caitlin hits him, and he restrains her to keep her from continuing to hit him. Justin testified that he has simply defended himself, and he denied threatening to kill Caitlin. When asked if he had caused the bruises on Caitlin depicted in the photos, he said, "It seems that way." Justin was questioned specifically about the January 7 altercation. He stated that neither he nor Caitlin had acted appropriately. Justin conceded that after throwing Caitlin on the floor, he had not gone to check on MC, who had started crying. He said that Caitlin had not deserved the beating, but he explained that he was angry because she had just hit him in the face. Justin testified that in his opinion, abuse in which one person has been slapped on the face and abuse that has left bruises all

6

over the other person's body are "comparable." He conceded that he probably weighs sixty pounds more than Caitlin but said that "[w]eight doesn't have anything to do with how hard someone strikes you." Justin eventually admitted that he is "absolutely" much stronger than Caitlin and said that he had not noticed whether she has ever left a mark from striking him.

Justin further testified that he does not think he has an anger-management problem but that he completed an eight-hour and a twelve-hour anger-management course. Justin stated that he is not in therapy and had not tried therapy because everyone has different ways of coping with things. He agreed that he had said in the past that therapy never helped anybody, but now he thinks therapy might be helpful.

Justin testified that the parties separated on January 7 and that he was not given an option to visit MC. He said that he had, however, asked for visitation with MC through his attorneys and through OurFamilyWizard but that he did not get to see her until September 30 for a two-hour supervised visit. Justin explained that he does not have his own home yet because the parties had been ordered by the court not to purchase anything over $500 but that he planned to move somewhere between Benton and Little Rock. He said that he had not put MC on his dental-insurance plan because she is only one year old but that he had told Caitlin that he would pay out of pocket for MC's dental visits.

Justin testified that he is asking for 50/50 joint custody. He testified that he thinks the parties are capable of coparenting. Justin said that Caitlin is a great mom, described her as "caring, loving, organized," and agreed that she is "a good person." Justin conceded that he had not paid child support for the past eleven months but explained that he had not been

permitted to communicate with Caitlin because of the order of protection. Also, he said that his parents had offered Caitlin "everything." Justin admitted that he could have used his attorney as a "conduit" to pay support for MC but had not.

The trial court made the following findings in the divorce decree:

> The parties have a very volatile relationship and when an argument arises, they often became violent with each other. The testimony established that when the parties had these violent arguments, the Plaintiff was the first aggressor. Defendant would then react with physical violence. But, Defendant's physical violence would turn to rage. He admitted while he suffered no physical injury from her actions, she did suffer injury and harm from his actions. One particular incident between the parties led to a final order of protection being issued against Defendant in 60DR-23-97. The Defendant has failed to accept his role in the violence between himself and the Plaintiff. Instead, he thought his actions were no worse than hers. The Plaintiff, on the other hand, has shown remorse and regret and is taking steps in the right direction to cure any anger issues that she may have by taking anger management courses and attending therapy.

> The Defendant failed to seek time with his child by placing hunting as a priority after her birth and through the separation. Defendant admitted that hunting was his first priority during hunting season. The Defendant took no interest in improving his marriage and spending time with the Plaintiff or his child even when Plaintiff offered to pay him $500 to miss a work shift so that he could spend time with the child and not miss an opportunity to hunt. When she complained about his time spent hunting, he would tell her "to get over it."

> The Defendant has failed to provide support in any manner whatsoever since January 2023. Likewise, he did not attempt to see his child for several months during this pending divorce case.

> The Court finds that the parties are unable to co-parent. The Defendant has refused to answer simple questions throughout the process of the divorce. Just calling the Plaintiff a "Good Mom" is not a form of co-parenting. This failure to communicate shows that the Defendant is not interested in co-parenting. The Court is of the belief that the refusal and failure of the Defendant to co-parent is partly what caused the parties to be in front of this Court on a divorce action.

II. *Discussion*

A. Violation of Scheduling Order

The parties disagree on whether this is a discovery issue or a motion-in-limine issue, but the standard of review is the same. Imposing a sanction for violating discovery rules rests in the trial court's discretion. *Martin v. Jimenez*, 2016 Ark. App. 268, 493 S.W.3d 347. When evidence is admitted upon the trial court's grant or denial of a motion in limine, our standard of review is whether the trial court abused its discretion. *Jarrett v. Brand*, 2017 Ark. App. 276. A trial court abuses its discretion if it acts improvidently, thoughtlessly, or without due consideration. *Id.*

Justin argues that prohibiting him from introducing evidence as a sanction for violating the trial court's scheduling order was not appropriate because it is contrary to making a determination concerning MC's best interest given that it prevented him from presenting a case. Justin contends that this sanction punished him for his attorney's failure to timely exchange a witness list, which was out of his (Justin's) control. Justin points out that he did not have a history of violating the trial court's orders and that other sanctions were available, like contempt or a continuance. He maintains that punishing him for violating a court order should not override the paramount consideration in all custody cases, which is the best interest of the child. *Bernal v. Shirley*, 96 Ark. App. 148, 239 S.W.3d 11 (2006).

To challenge a ruling excluding evidence, an appellant must proffer the excluded evidence so the appellate court can review the decision, unless the substance of the evidence

is apparent from the context. *Robison v. Ark. Dep't of Human Servs.*, 2024 Ark. App. 298. The failure to proffer evidence so that the appellate court can determine whether prejudice resulted from its exclusion precludes review of the evidence on appeal. *Id.* We must point out that Justin was not prohibited from introducing exhibits. He argues that he attempted to introduce a text message between the parties in which Caitlin admitted that she was the one who had initiated the violence every time. Caitlin objected to the evidence, and the trial court sustained the objection. Justin argues that it was clear that the trial court was not going to allow him to introduce exhibits and that it was not necessary for him "to attempt to introduce and proffer every text message" because he knew that Caitlin's objections to his exhibits would be sustained. We are not prepared to say that the trial court abused its discretion when Justin did not attempt to introduce exhibits despite the trial court's earlier ruling that it would address each exhibit as it came up at trial.

As for Justin's excluded witnesses, he made no proffer of their testimony. Justin asserts that the substance of their testimony was clear and obvious; therefore, a proffer was not necessary. Justin contends that the evidence would have shown that he was not a domestic abuser and that he did not choose deer hunting over his child. This proffer on appeal comes too late. In his reply brief, Justin says that his attorney argued at the time the motion in limine was granted that the witnesses were "all family members" and that they were the "exact same witnesses anybody would expect in a case like this." This proffer is insufficient in terms of substance and calls for speculation. *Grinning v. City of Pine Bluff*, 322 Ark. 45, 50, 907 S.W.2d 690, 692 (1995) (reversing and remanding but recognizing that

10

record was insufficient to demonstrate *Batson* error, e.g., the prosecutor's proffered racially neutral explanation of "past performance" lacked details).

The trial court set forth in the order itself the possible consequences for violating the scheduling order, and Justin's counsel clearly violated it. Although the trial court had other options available to it, we cannot say under the facts of this case that there was reversible error in choosing this sanction. Here, Justin had not alleged that Caitlin was a bad mother or that MC would be in harm's way in Caitlin's care. Indeed, he testified to the contrary—he said that Caitlin is a "great mom"; he could not identify any weaknesses she had as a parent; and he had no concerns with MC being around anyone in Caitlin's family. Generally, the better practice—especially in a child-custody case—is to hear evidence from both parties about what is in a child's best interest; however, in this particular situation, we cannot say that the trial court abused its discretion in granting Caitlin's motion in limine with regard to Justin's witnesses.

## B. Joint-Custody Presumption

In an action for divorce, an award of joint custody is favored in Arkansas. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2023). In an action concerning an original child-custody determination in a divorce, there is a rebuttable presumption that joint custody is in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)(*a*). Section 9-13-101(a)(1)(A)(iv)(*b*) provides that the presumption may be rebutted:

> *(1)* If the court finds by clear and convincing evidence that joint custody is not in the best interest of the child;

*(2)* If the parties have reached an agreement on all issues related to custody of the child;

*(3)* If one (1) of the parties does not request sole, primary, or joint custody; or

*(4)* If a rebuttable presumption described in subsection (c) or subsection (d) of this section is established by the evidence.

While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child. *McCandlis v. McCandlis*, 2024 Ark. App. 339. We refuse to find differently than the trial court regarding the appropriateness of joint custody and the credibility of the witnesses. *Id.* Each child-custody determination ultimately must rest on its own facts. *Id.*

Justin argues that subsection (c), referred to above in section 9-13-101(a)(1)(A)(iv)*(b)(4)*, involves findings of domestic violence, which were made here by the trial court as to both him and Caitlin. Justin argues that many of the trial court's reasons for finding that the presumption of joint custody was rebutted were inaccurate and resulted from hearing only one side of the evidence. He also argues that the order of protection made things difficult—if not impossible—for him. Justin argues that the trial court found that he had done nothing to accept his role in the altercations even though the record showed that both he and Caitlin had completed anger-management classes, yet the trial court found that Caitlin seemed to be taking a step in the right direction. Justin points out that Caitlin admitted she was the initial aggressor every time that an altercation got physical. He states that the trial court found that coparenting was not possible because he refused to answer

simple questions but that there were text messages in which both he and Caitlin said to each other that their attorneys should get involved.

We cannot say that the trial court clearly erred in finding that joint custody was not in MC's best interest for reasons aside from the findings of domestic violence. Justin admitted that he did not provide any financial support for MC for eleven months. A parent has a moral and legal obligation to support his child regardless of the existence of a support order. *In re Adoption of A.M.P.*, 2021 Ark. 125, 623 S.W.3d 571. Also, Justin conceded that he did not ask to see MC for six months after the parties separated. *In re Adoption of Minor Child.*, 2025 Ark. App. 116, 708 S.W.3d 784 (holding that biological father's consent to adoption was not required when he failed to communicate with minor children without justifiable cause, rejecting his claims that his incarceration and an order of protection made his lack of communication involuntary and beyond his control). The trial court also found that Justin and Caitlin lacked the ability to coparent MC given their difficulty communicating with each other. *Styles v. Styles*, 2024 Ark. App. 435, 699 S.W.3d 693 (affirming award of primary custody to father in initial custody determination because, regardless of whether joint custody is favored, joint custody was not in children's best interest due to parties' inability to cooperate in coparenting).

Finally, while it is true that both parties had been abusive toward each other, the trial court found that Justin's anger tended to turn to rage, which led to potentially more serious injuries to Caitlin. Although the trial court found in the decree that Caitlin appeared to be taking a step in the right direction by attending anger-management classes and therapy, we

note that the testimony showed that both parties had completed anger-management classes. When the trial court referred from the bench to Caitlin's taking a "step in the right direction," its ruling appeared to hinge on the fact that Caitlin had sought counseling for her anger and aggression. The testimony established, on the other hand, that Justin does not think he has an anger problem, that he had rebuffed the suggestion of counseling in the past, and that he only grudgingly admitted that counseling might help him now.

## C. Domestic Violence and Abuse

Arkansas Code Annotated section 9-13-101(c)(1) provides that, if a party to an action concerning custody of a child has committed an act of domestic violence against the party making the allegation and such allegations are proved by a preponderance of the evidence, the trial court must consider the effect of the domestic violence on the best interest of the child, regardless of whether the child was physically injured or personally witnessed the abuse, together with any facts and circumstances the trial court deems relevant. Moreover, there is a rebuttable presumption that it is not in the best interest of the child to be placed in the custody of an abusive parent when there is a finding by a preponderance of the evidence that the parent has engaged in a pattern of domestic abuse. Ark. Code Ann. § 9-13-101(c)(2).

Justin argues that the trial court did not appear to have analyzed the effects of domestic violence on MC in its oral ruling or in the decree. The trial court, however, heard testimony about incidents of domestic violence on the part of both parties during the two hearings held on the orders of protection. The trial court noted that MC had not been

14

physically harmed and, as a result, refused to extend the order of protection as to MC. At the divorce hearing, the trial court had in evidence an audio/video recording from MC's baby monitor of the January 7 altercation showing then three-month-old MC in her bassinet with the parties' altercation going on in the shadows around her. The statute does not require the trial court to make specific findings about the effect that domestic violence has on a child. All the trial court has to do is consider the effect of domestic violence when determining the best interest of the child. *Szwedo v. Cyrus*, 2020 Ark. App. 319, 602 S.W.3d 759. Here, there is no indication that the trial court did not consider the effect that the parties' domestic violence had on MC.

Also, Justin argues that the evidence showed that Caitlin had committed multiple acts of domestic violence against him and that she had engaged in a pattern of domestic abuse. He asserts that she even admitted she was the initial aggressor each time things got physical. Justin points out that, while there is a finding that the presumption in favor of joint custody had been rebutted, there was no finding in the oral ruling or in the decree that the presumption that it is not in a child's best interest to be placed in the custody of an abusive parent had been rebutted.

The trial court does not have to explicitly state that a presumption has been "rebutted" as long as there is evidence to support the ultimate decision because we assume that the trial court made the findings necessary to support its judgment. *See Biggerstaff v. Biggerstaff*, 2025 Ark. App. 105. Despite the presumption, we cannot conclude that the trial court erred in ultimately awarding primary custody of MC to Caitlin. As Judge Cracraft

wisely wrote for this court more than thirty years ago, "[trial courts] cannot always provide flawless solutions to unsolvable problems, especially where only limited options are available." *Respalie v. Respalie*, 25 Ark. App. 254, 257, 756 S.W.2d 928, 930 (1988). Here, the trial court acknowledged that Caitlin had committed domestic violence against Justin and that Caitlin was the initial aggressor; however, Justin had also committed domestic violence against Caitlin, and his rage toward her had resulted in Caitlin's suffering physical injuries. The trial court found that, unlike Justin, Caitlin had expressed remorse for her actions and had sought counseling to learn how to deal with conflict resolution.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Digby Law Firm*, by: *Mathew R. Ingle*, for appellant.

*The Ballard Firm, P.A.*, by: *Andrew D. Ballard*, for appellee.