Cite as 2026 Ark. App. 290

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-25-460

| | |
|---|---|
| CLINTON GREENWOOD | Opinion Delivered May 13, 2026 |
| APPELLANT | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT |
| V. | [NO. 63DR-24-146] |
| KATHRYN GREENWOOD | HONORABLE BRENT DILLON HOUSTON, JUDGE |
| APPELLEE | AFFIRMED |

## N. MARK KLAPPENBACH, Chief Judge

Appellant Clinton "Drew" Greenwood appeals the circuit court's 2025 divorce decree awarding appellee Kathryn "Katie" Greenwood primary custody of their son, MC, and granting him supervised visitation. Drew contends that the circuit court clearly erred by rejecting the presumption in favor of joint custody, by giving Katie custody, and by requiring that his visitation be supervised. We affirm.

The parties married in 2020, and MC was born in March 2023. The parties separated in December 2023. In January 2024, Katie obtained a temporary order of protection against Drew. In February, Katie filed for divorce and requested custody of MC. Drew responded by filing a counterclaim for divorce and also requested custody of MC. Drew remained in the marital home.

In March, the circuit court entered a three-year order of protection (March 2024 through March 2027) preventing Drew from contacting Katie and MC. Pending divorce, Katie had primary custody, and Drew was allowed visitation, to be supervised by his parents, who came to Arkansas from Texas every other weekend. Communication about MC was to go between Katie's and Drew's parents. The parties went to mediation in an effort to settle their issues but were unsuccessful. In October 2024, Katie filed a motion for contempt in the order-of-protection case. Drew was subsequently held in contempt of that order in the same circuit court.[1]

The divorce trial was heard in April 2025. Drew admitted that since they separated, he had taken cell-phone pictures of what Katie had in her Spotify account (descriptions of books in her queue) and had contacted one of her friends through Facebook. He denied any untoward intentions and explained how and why that happened. He said the Spotify account was on the television in their home, and there was nothing improper in asking her friend how Katie was doing.

Drew testified about the incident that occurred in December 2023 that led to the order of protection. He said that on that night, he was driving; Katie's behavior was chaotic; and he threw or "tossed" a bag containing a bottle in her direction, and it hit her in the face,

---

[1]The order-of-protection case, 63DR-24-17, is the subject of a separate appeal, CV-25-459. The initial three-year order of protection was in effect when Katie accused Drew of harassing, monitoring, and stalking her. This led to an order extending the order of protection through March 2030. That order is also on appeal and decided this day. *See Greenwood v. Greenwood*, 2026 Ark. App. 306, ___ S.W.3d ___ (CV-25-459).

giving her a bloody and blackened eye. He agreed "[t]here is zero justification for that whatsoever." He did not appeal the three-year order of protection. Drew said that the order of protection made him miss his son's first birthday party, so he and his parents had a separate party for him.

Drew explained how much he adores MC. He spent a lot of time with MC and took care of MC before he and Katie separated. Drew described MC as a happy boy who loves being with him and his parents and playing with his toys. He presented multiple photographs to show the fun times with MC, both before and after he and Katie separated. He admitted that he made some crude remarks to Katie about MC but said he was only joking. Katie had accused him of abusing her in front of MC, but Drew said that did not happen.

Cross-examination was contentious. Drew was repeatedly admonished to listen to the questions and answer them, not argue with counsel. The circuit court told Drew, "I'm real close to holding you in contempt, okay?" On cross-examination, Drew was asked if a person could be abused but not show any outward signs of it. He responded, "I know where you're trying to go with it," and said that MC was not abused in his care.

Drew said that because Katie had accused him of physically abusing MC, he and his parents would take videos of MC at the beginning and end of visitation, and he put "nanny cams" all over the house to protect himself from unfounded allegations of abuse. Drew became upset when questioned about stripping MC naked to take the pictures, and the circuit court admonished Drew, "Sir, sir, sir. Sir, let's calm down, okay. Let's just calm down

3

and just answer the question, okay?" Drew said he and his parents would take off MC's clothes at the beginning of visitation, wash them, and put them back on MC at the end of visitation to return to Katie. He said MC was not bothered and would giggle.

Drew complained about Katie's "toxic" parents; Katie's emotional issues that probably stemmed from her abusive father; and her repeatedly volatile, verbally abusive, and physically abusive behavior toward him. She would scream and throw things at him, she had bitten him, and she tried to jump from a moving car. He said he would have to physically restrain her from beating him up. He said Katie repeatedly acknowledged him as a good man, husband, and father until about the end of 2023. It was concerning to him that Katie told him in July 2023 that her father had "punched her in the face," which had happened in front of MC. He wanted custody of MC.

Drew said that after the order of protection was entered, he started counseling and completed an anger-management class to show his good faith and that he was doing everything possible to have MC. He denied actually having anger issues and thought the bigger issues were with Katie and her family.

Katie's licensed professional psychotherapist, Teresa Qualls, testified that Katie had been in therapy with her since January 2024, at first once or twice a week. Qualls initially observed that Katie had a black eye; Katie was afraid, tearful, and distressed. Katie feared "being watched" and was borderline paranoid; she had frequent nightmares and flashbacks. Qualls said their sessions did not delve into any possible abuse Katie might have suffered from her relatives; the focus was on her marriage and relationship with Drew.

4

Katie complained about Drew's controlling behavior. Katie was affected by Drew's moods, his calling her names, and his making her feel like she was crazy. Qualls said that Katie described one incident when Drew made her wait in the tub as he brought pans of water he boiled in the kitchen and poured them into the tub. Katie told her that Drew had held her down to the point she could not breathe, and she described an incident when Drew threw something toward her while she was holding MC. Katie told her things escalated after MC was born. Katie remained in therapy, but her coping skills and resilience had improved. Qualls diagnosed Katie with PTSD, anxiety, depression, and hypervigilance, all attributed to her relationship with Drew.

Katie testified that she struggled at first thinking that she deserved Drew's abuse, but she was thankful she decided to stand up for herself and MC. She was still experiencing nightmares and panic attacks. She recalled Drew holding her down at least five times, pinning her down on the ottoman, the couch, the bed, or the floor, making it hard for her to breathe. She would scream and scratch or bite him to get him off of her. She had thrown things at him. She remembered an incident when Drew had a knife. Drew would scream and yell at her in front of MC. She recalled an argument when he smashed her cell phone. He told her he was glad and that it would serve as a reminder for her to be good. She said he would not stop the car to let her feed MC; he continued driving really fast for about an hour. Katie said MC was present for some of these abusive events. She talked about an

incident when he thew a vase and hit her eye, bloodying and blackening her eye.[2] She said a doctor told her to leave the dangerous, abusive situation. Katie admitted that her father had "backhanded" her one time at his house, but MC was not present. She said Drew would use that incident as a justification for his ongoing abuse of her. She initially left the marriage and went to her father's home because she needed somewhere to go, but she had since moved elsewhere with MC.

Katie was afraid of Drew's anger, his failure to follow the order of protection, and potential danger to MC if he were alone with Drew; they could not communicate to reach joint decisions about MC. Katie said Drew never expressed concerns about her caring for MC until this litigation. Katie stated that MC's behavior would be noticeably changed for a couple of days after he returned from Drew's visits: he would avoid diaper changes, clothing changes, and bathing. Katie said Drew continued to stalk her and MC. Katie wanted custody of MC and for Drew to have supervised visitation.

Katie's father acknowledged slapping Katie's face one time to get her attention, but he apologized several times. He supports Katie and expressed concern over Drew's controlling and belittling behavior. Katie's mother expressed concern over Drew's controlling, mean behavior toward MC and the awful things she heard him say to Katie to make her feel inferior. Katie's mother believed that any disagreements and spats on the

---

[2]The circuit court considered Katie's trial exhibits that included (1) an up-close color photograph of her face with blood running down from her left eye and (2) urgent care medical documentation and billing statements to substantiate the medical treatment she received. Drew was ordered to pay for her medical care, which he does not appeal.

maternal side of the family were typical; she said her husband popped Katie in the face that one time but apologized.

Drew's father described Drew as a doting and caring father. He acknowledged that they would take videos or pictures of MC at the beginning and end of visitation to show how well MC was being cared for. Drew's father said that when he and his wife came for visits with MC, the visits were "outstanding" and "a highlight." He believes his son is a great father and that he made a terrible mistake that one time hitting Katie in the face. He acknowledged "drama" in the family but clearly thought Katie was the primary problem.

Katie asserted that joint custody was inappropriate, the presumption had been rebutted, Drew's domestic abuse substantiated a rejection of joint custody, and supervised visitation was in MC's best interest. Drew's argument was diametrically opposed. He asserted that Katie is volatile and has a volatile family situation, that Katie is not credible and had abused the legal process to get an order of protection following that one unfortunate event, that they were not good spouses for each other but that he is a good parent, and that joint custody had not been rebutted.

The circuit court's divorce decree contained the following relevant findings:

5. There is one minor child of the marriage, namely [MC] who was born in 2023, and no other children are expected.

6. In a related case, *Greenwood v. Greenwood*, 63DR-24-17 this Court entered a Final Order of Protection in favor of the Plaintiff Kathryn Greenwood and [MC] against the Defendant Clinton Greenwood, on or about March 13, 2024. There was not an appeal of this Court's ruling in that case.

7

7. While the order of protection was initially for three (3) years, in a separate order entered this date, this Court extended it to March 13, 2030 after having found the Defendant had violated its terms and conditions.

8. The Final Order of Protection granted supervised visitation to the Defendant on an every-other-weekend basis. The supervisors are to continue to be his parents who travel from Texas to see him and [MC] for these visits. The parties may agree on another supervisor(s) in writing, if someone becomes available. Arrangements for visitation exchanges shall continue to be made by the parties' parents for the present time. Once the Order of Protection has expired, all future visitation exchanges shall occur at the Saline County Sheriff's Office. The parties may also agree in writing to modify this location.

9. With respect to the custody of [MC], the Court must consider the statutory considerations outlined in A.C.A. § 9-13-101 as it pertains to joint custody. With respect to this case, the Court is considering the following relevant sections of the statute, to-wit:

(a)(1)(A)(iv)
*(a)* In an action concerning an original child custody determination in a divorce or paternity matter, there is a rebuttable presumption that joint custody is in the best interest of the child.
*(b)* The presumption that joint custody is in the best interest of the child may be rebutted:
*(1)* If the court finds by clear and convincing evidence that joint custody is not in the best interest of the child;
*(2)* If the parties have reached an agreement on all issues related to custody of the child;
*(3)* If one (1) of the parties does not request sole, primary, or joint custody; or
*(4)* If a rebuttable presumption described in subsection (c) or subsection (d) of this section is established by the evidence.

. . . .

(c)(1) If a party to an action concerning custody of or a right to visitation with a child has committed an act of domestic violence against the party making the allegation or a family or household member of either party and such allegations are proven by a preponderance of the evidence, the circuit court must consider the effect of such domestic violence upon the best interests of the child, whether or not the child was physically injured or personally

8

witnessed the abuse, together with such facts and circumstances as the circuit court deems relevant in making a directive pursuant to this section.

(2) There is a rebuttable presumption that it is not in the best interest of the child to be placed in the custody of an abusive parent in cases in which there is a finding by a preponderance of the evidence that the parent has engaged in a pattern of domestic abuse.

10. Using the above two standards which are applicable in this case, the Court finds by clear and convincing evidence that the presumption of joint custody has been rebutted; for the reasons cited herein, it is not in the best interests of [MC] for joint custody to exist and the Plaintiff should be awarded full custody of [MC].

11. Additionally, the Court finds the Defendant has undertaken a pattern of domestic abuse in the household. The presumption that it is not in the best interests of the minor child for the Defendant to have custody of the minor child has not been rebutted in this case by a preponderance of the evidence.

12. Both of the above determinations are based upon the following findings of fact, using the appropriate evidentiary standard as set forth in the statute, to-wit:

(a) The existence of a Final Order of Protection in 63DR24-l7, as stated above (see Plaintiffs Exhibit 5);

(b) The physical injuries the Plaintiff sustained as a result of being hit by a vase of olive oil in the face which resulted in her seeking medical treatment (see Plaintiffs Exhibit 18);

(c) The testimony of Teresa Qualls, LPC, a licensed psychotherapist treating the Plaintiff, who testified the Plaintiff suffers from Post-Traumatic Stress Disorder (PTSD) as a result of the domestic abuse caused by the Defendant. She recited several abuse incidents involving the Plaintiff and the Defendant, such as him placing boiling water in a bath for the Plaintiff because the water was not hot enough; the Defendant holding the Plaintiff down and her being unable to breathe; his controlling behaviors over her; his mood swings including becoming angry; the Defendant calling the Plaintiff names; and one incident involving [MC] where something was thrown toward [MC] by the Defendant. Ms. Qualls testified that the Plaintiff, as part of her PTSD diagnosis, suffers from being distressed, afraid, distraught, and has flashbacks;

(d) During the cross-examination of the Defendant by Ms. Rogers, the Defendant when questioned about why he and his mother video and take

photographs of [MC] naked at both the beginning and end of his visitation times (a total of 64 separate incidents of photographing [MC] at the time of the hearing according to the Defendant), the Defendant became visibly angry on the witness stand to the point the Court stopped the questioning of him and instructed the Defendant that he needed to calm himself and to take a few deep breaths before cross-examination resumed. With this outburst in open court the Court observed how angry the Defendant became in a short period of time. This along with the evidence of physical harm to the Plaintiff and the Defendant's inability to control himself on the witness stand, has elevated the Court's concern about [MC] being left alone with the Defendant, should he lose his temper in front of him, for whatever reason;

(e) The Plaintiff testified about the abuse she suffered by the Defendant, including that during their marriage the Defendant had held her down five (5) times, causing her difficulty in breathing; of these occasions, [MC] was present twice when they occurred; the incident when she was struck in the face by the vase of olive oil; an incident where the Defendant was driving fast and refused to stop the car for an hour before eventually stopping the car in order to allow the Plaintiff to feed [MC]; and the Defendant throwing her cellphone down onto the floor breaking it when they lived in Tulsa; and

(f) The parties are unable to properly communicate with each other concerning [MC], even if the Final Order of Protection was not in place.

13. The Defendant asserted that the testimony of the Plaintiff was not credible, pointing to one incident where she lied to the Defendant about a car wreck involving [MC]. This incident, while casting some amount of doubt on her credibility, is not sufficient to overcome the credible testimony of abuse and the corroboration of it through Plaintiffs Exhibit 18 and the testimony of Ms. Qualls concerning the Plaintiff's PTSD.

14. The Court also finds that the Defendant has credibility issues as well. During the hearing it appeared the Defendant was attempting to respond to Ms. Rogers' questions and form his answers based upon "where he believed she was going" with her examination, which he mentioned in one of their colloquies prior to answering her question.

15. Based upon the foregoing, the Plaintiff shall have full custody of [MC]. The Defendant, because of the concerns of domestic abuse recited above, shall continue to have supervised visitation every other weekend, from Friday at 6:00 pm until Sunday at 6:00 pm. Once [MC] is old enough to be able to effectively

communicate with others and if the Defendant is able to demonstrate that he no longer poses a threat of domestic abuse, the Court will consider a revision to the requirements of supervised visitation.

16. As indicated above, the Defendant disclosed at the final hearing he is videoing and/or photographing [MC] at the beginning and at the conclusion of every visitation time. [MC] at the time of this decree is roughly two (2) years of age. The Defendant testified that he had done so to gather evidence that he was not abusing [MC] and would have therefore have proof he did not injure [MC] during his visitation times. While the Court understands why the Defendant is concerned and wants to gather and maintain proof of his innocence, this activity has to be traumatic and demoralizing to [MC]. The Defendant never stated at what age he would stop this intrusive behavior. Based upon the adverse effect this will have on [MC], the Defendant may take discreet photographs of any injuries or bruising of [MC] he observes while in his care, but the videoing and photographing of [MC] completely naked during his visitation time must stop immediately.

On appeal, Drew argues that the circuit court clearly erred in rejecting joint custody and awarding Katie custody and, furthermore, that it abused its discretion in ordering supervised visitation. His arguments are subdivided into four assertions: (1) the findings were improperly premised on an invalid order of protection and contempt of that order; (2) even if the order of protection is valid, the findings improperly rested on the order of protection rather than on MC's best interest; (3) even if the decision was based on a best-interest analysis, Katie should not have been awarded custody; and (4) even if Katie was properly awarded custody, the circuit court abused its discretion in ordering that his visitation be supervised. We hold that Drew has failed to demonstrate reversible error.

We review child-custody cases de novo but will not reverse the circuit court's findings unless they are clearly erroneous. *Inmon v. Davis*, 2025 Ark. App. 494, 724 S.W.3d 657. A finding is clearly erroneous when, although there is evidence to support it, after reviewing

11

the entire evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id.* We give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given to their testimony. *Id.* Thus, a circuit court may disregard a witness's testimony if it finds it not credible. *See Oates v. Oates*, 2010 Ark. App. 345, 377 S.W.3d 394.

Joint custody is favored in Arkansas. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2025); *Tubbs v. Tubbs*, 2025 Ark. App. 315, 716 S.W.3d 204. There is a rebuttable presumption that joint custody is in the best interest of the child when deciding original child custody in a divorce action. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)*; *Tubbs*, *supra*. That presumption, however, can be overcome if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)*; *Tubbs*, *supra*. The preference for joint custody "does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child." *Tubbs*, 2025 Ark. App. 315, at 12, 716 S.W.3d at 212.

Additionally, the presumption in favor of joint custody can also be rebutted if there is a finding by a preponderance of the evidence that a parent has "engaged in a pattern of domestic abuse." Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)(1)* and *(c)(2)*. A presumption is a "legal inference or assumption that a fact exists, based on the known or proven existence of some other fact or group of facts . . . . A presumption shifts the burden of production or persuasion to the opposing party, who can them attempt to overcome the presumption."

*Stills v. Stills*, 2010 Ark. 132, at 9, 361 S.W.3d 823, 828 (quoting *Black's Law Dictionary* 1223 (8th ed. 2004)).

"Domestic abuse" is defined in part as "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members." Ark. Code Ann. § 9-15-103(4)(A) (Supp. 2025). Our statutes do not define "pattern of domestic abuse," so we treat what constitutes a "pattern of domestic abuse" as a question of fact. *Wallace v. Pyle*, 2024 Ark. App. 496.

On de novo review of this record, we are not left with a firm and distinct conviction that a mistake has been made. The circuit court's findings are supported by the record.

Whether a circuit court's findings are clearly erroneous turns in large part on the credibility of the witnesses, and special deference is given to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Podleski v. Podleski*, 2025 Ark. App. 538, 725 S.W.3d 63. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id.* The primary consideration in child-custody cases is the welfare and best interest of the child, with all other considerations being secondary. *Id.* Although joint custody is favored in Arkansas, it is not mandatory. *Id.*

This case turned on credibility, and the circuit court found that Drew's was lacking. Regardless of the existence of the order of protection, evidence of Drew's controlling and abusive behavior was abundant in this trial. Drew contends that any allegations that he broke Katie's phone, yelled at her, or harassed her simply do not count as "domestic abuse."

If that were all that was evident in this record, we might agree with him. However, Drew threw a bottle at Katie and injured her significantly, for which Drew acknowledged there was no justification. Katie had a photograph and medical documentation to support this injury. The court believed Katie when she explained how Drew *repeatedly* physically held her down and made it difficult for her to breathe. The circuit court believed that Drew was the source of Katie's PTSD and anxiety because of Drew's many disturbing acts and behaviors. Katie testified that she was perpetually afraid for herself and MC. The circuit court believed—and saw—Drew's inability to control himself, volatility, and angry outbursts.

Whether there were abusive instances and the extent of those abusive events were matters for the circuit court's credibility determinations. The circuit court found that the therapist's testimony and the photograph of Katie's injuries corroborated Katie's claims of domestic violence. Even Drew acknowledged that he caused the injury to Katie's face; he acknowledged that he physically held Katie down sometimes. The parties acknowledged that they had a volatile and uncooperative relationship, though each placed far more responsibility on the opposing side. Their discord lent additional support to the court's decision that joint custody was not in MC's best interest. The circuit court took pains to set out the relevant statutory considerations on joint custody and the levels of proof necessary to rebut the presumption, and it awarded primary custody in line with its determination of weight to be given the evidence. What Drew asks is that we reweigh the evidence in a manner that supports his desired outcome. This is not the function of the appellate court. *Hamerlinck v. Hamerlinck*, 2022 Ark. App. 89, 641 S.W.3d 659. Each child-custody

14

determination ultimately must rest on its own facts. *McCandlis v. McCandlis*, 2024 Ark. App. 339.

Whether visitation should be supervised as a safety measure is a decision left to the sound discretion of the circuit court. *Baber v. Baber*, 2011 Ark. 40, 378 S.W.3d 699. When the best interest of the child is at stake, the circuit court should look to the particular circumstances of each case and act as the welfare of the child requires. *Haynes v. Haynes*, 2026 Ark. App. 124, ___ S.W.3d ___. The circuit court left open the possibility that Drew would be allowed unsupervised visitation in the future. *See Tanner v. Tanner*, 2015 Ark. App. 668, 476 S.W.3d 832. Again, given the evidence of Drew's anger-fueled outbursts and tendencies confirmed by his behavior in court, ordering that visitation with this small child be supervised by the grandparents is not an abuse of discretion.

In sum, we have conducted a de novo review of this record applying the proper standard of review, and we conclude that Drew has failed to establish reversible error.

Affirmed.

GLADWIN and HIXSON, JJ., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellant.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Lauren White Hoover*, for appellee.

15